# CHARLESTON.

STATE *ex rel.* JOSEPH PALMER *v.* MARGARET POSTLETHWAITE

(No. 6393)

Submitted October 3, 1928.   Decided November 20, 1928.

*Larrick & Lemon,* for relator.

*Poffenbarger & Poffenbarger* and *E. H. Yost,* for respondent.

LITZ, JUDGE:

The relator, Joseph Palmer, seeks by writ of habeas corpus to obtain from respondent, Margaret Postlethwaite, the custody of his eleven year old son, Joseph Carl Palmer, the offspring of a marriage between relator and Dochia Postlethwaite who is a daughter of respondent.

By decree of October 19, 1922, the circuit court of Wetzel county granted to relator an absolute divorce from the mother, Dochia Postlethwaite Palmer, and the custody, care and control of the infant. It seems that the parents separated in 1921, before the institution of the suit for divorce, when the child was taken by the mother to the home of respondent in the town of New Martinsville, where he has since remained under the care and control of the grandmother. The father having remarried in February of this year, thereafter, in

August made demand on respondent for the custody of the child.

The grandmother claims that on or about the date of the divorce decree, the relator relinquished to her his right of custody, care and control of Joseph Carl, while the father asserts that the child has remained with her under a contract whereby she agreed for a monetary consideration, which he was to pay her semi-annually on the first of January and July, to keep the infant until he was in a position to assume direct responsibility for the proper rearing of the child. As evidence of his contention, the relator presents the following paid checks issued by him to the respondent: check, dated February 3, 1921, "for Carl", $50.00; check, dated January 1, 1923, "in full for Carl maintenance", $26.00; check, dated July 1, 1923, $8.00; check, dated January 1, 1924, $18.50; check, dated July 1, 1924, "in full C. Palmer", $30.00; check, dated January 1, 1925, "in full", $23.50; check, dated July 1, 1925, "in full to date", $20.00; check, dated January 1, 1926, "C. P.", $45.00; check, dated July 1, 1926, "to date", $21.00; check, dated January 1, 1927, "C. P.", $34.25; check, dated July 1, 1927, "in full to date", $39.50; check, dated January 1, 1928, "in full to date C. P.", $40.00; check, dated July 1, 1928, $38.00. The relator also files paid checks which he claims were issued by him to John F. Loehr in payment of clothing for Joseph Carl, as follows: check, dated January 1, 1923, to John F. Loehr, "for Carl's clothing", $25.00; check, dated December 14, 1926, to John F. Loehr, "for Carl's clothing", for $10.00; check, dated March 18, 1926, to John F. Loehr, "for Carl's shoes, etc.", $5.00.

As further proof of the nature of the agreement, the father relies upon the institution of an action (now pending) in the circuit court of Wetzel county by respondent soon after his demand upon her for the custody of the child, in which she seeks to recover judgment against him on a sworn statement of account which follows:

"Board or meals furnished Joseph Palmer by plaintiff at his instance and request from September 1, 1922, to Febru-

ary 1, 1928, inclusive, at $6.00 per week, (281½ weeks) .................................................$1,689.00

Board and room rent furnished Carl Palmer (infant son of Joseph Palmer) by plaintiff at the instance and request of Joseph Palmer, from December 1, 1921, to August 20, 1928, inclusive, at $8.00 per week (349½ wks.)........................................... 2,796.00

Washing and ironing and caring for Carl Palmer by plaintiff at the instance and request of Joseph Palmer, his father, from December 1, 1921, to August 20, 1928, inclusive, at $2.00 per week................ 699.00

Funds furnished to Carl Palmer by plaintiff at instance and request of Joseph Palmer for hair cuts from December 1, 1921, to August 20, 1928, inclusive............. 30.00

School supplies furnished Carl Palmer by plaintiff at instance and request of Joseph Palmer from August 20, 1923, to August 20, 1928............................................. 15.00

$5,229.00''

The evidence of numerous witnesses has been filed in behalf of the parties attesting the fitness of each for the trust. Upon consideration of which, as well as the evidence relating to the agreement or understanding between the parties, whereby the care, custody and control of the infant was intrusted to the respondent, the facts, that the father is a substantial business man in the vigor of life, and that the respondent, of advanced years, conducts a boarding house in her home by which, as it is claimed, she furnishes the main support for her family consisting of herself, husband, married son, daughter-in-law, and two grandsons other than Joseph Carl, and the evidence offered by the relator of alleged intemperate habits of some of the members of her family, the court is of opinion that it would be to the interest of the infant to transfer his custody and control to the father. The welfare of the child is the polar star by which the discretion of the court is to be guided. It is, however, a severe blow to the grandmother who has with great patience and tender care reared the child through the most impression-

able stage of his life to be compelled at this time to surrender his custody and control to another; and I, as an individual member of the Court, would be inclined to leave him where he is, particularly in view of his pronounced preference for the grandmother as shown by his intelligent testimony, containing liberal cross-examination, filed on her behalf. "The wishes of children of sufficient capacity to choose for themselves should be given especial consideration when their parents have for a long time voluntarily allowed them to live in the family of another; and the court will make no coercive order in such cases to enforce the mere legal right of the parent to their custody against the manifest inclination and against the reasonable choice of the children to remain where they are—where the sweet tendrils of childhood have first clung to all they know of home. A parent, by transplanting his offspring into another family, and surrendering all care of it for so long a time that its interests and affections attach to the adopted home, thereby seriously impairs his rights to have its custody awarded to him by judicial decree." Church on Habeas Corpus., section 447.

The custody of the child is awarded to the relator.

*Writ granted.*

LIVELY, PRESIDENT, concurring:

There can be little question of the parental right to the custody of the child, or its welfare in the custody of the father. His neighbors without exception say he is honorable and trustworthy. Divorced from respondent's daughter for good cause, the court found him to be a proper man and gave him custody of his child. Without a home then, he contracted with respondent to care for the child, then and now of tender years, and boarded with her where he could be with his boy as much as his business would permit. Now he has become married to an estimable woman and wants his offspring in his own home now being established. Respondent says on oath in this case that the father gave her the child to rear; in the law suit she says on oath that he contracted with her for a money consideration. Whether the atmosphere of the boarding house is such that the child should be removed there-

from is not so material as the atmosphere of the father's new home now being provided, which is conceded to be good. There is nothing against the father or his present wife or their new home which would militate against the welfare of the child. While the welfare of the child is the prime consideration (recognized and conserved in this case) "the legal rights of the parent will be respected, being founded in nature and wisdom, unless they have been transferred or abandoned." *Cunningham* v. *Barnes,* 37 W. Va. 746. Where there has not been such transference or abandonment by the parent, he is entitled to the custody of his offspring. The Civil, English and American courts uniformly recognize and enforce this natural right of the parent. A natural parent "who is of good character and a proper person to have the custody of the child and reasonably able to provide for it, is entitled to the custody as against other persons, although such others are much attached to the child, and the child is attached to them, *and prefers to remain with them,* and they are in all respects suitable to have the custody of the child and able to support and care for it, and even though they are of larger fortune or able to provide for the child more comfortably than the parent, or to care for it better, or to give it a better education than the parent can afford." 29 Cyc., p. 1590. It would be a dangerous and perversive doctrine to hold that the mutual affections of the child and its temporary custodian should annul the parent's natural right to his offspring. Mutual affections nearly always spring up between a young child and its custodian even though there may be no blood relationship. What red-blooded man would support a government which by its courts took from him his children because by force of circumstances he was obliged to place them in the care and temporary custody of another, on the sole ground of affection between his children and that other? In story, eulogy and song we have praised and commended the wonderful love of a mother for her child. But the love of a father for his boy is as deep and strong. It may not be as demonstrative or appealing. My experiences teach me (and I am an old man) that a true father will pass through untold miseries and woes for the welfare of his son,

often going to the extent of literally sacrificing his life. The whirlwinds of life may for the moment ruffle the surface of its sea, and may fleck with foam its superficial currents; they will never shake or trouble the clear unfathomable deep in which the Maker has placed the serene and constant love of a father for his son.

Woods, Judge, dissenting:

This case presents circumstances of interest and delicacy, involving both legal rights and the dearest feeling of the parties. On the one hand is the legal right of the father, and on the other, the feelings of the child, and the feelings and rights, such as these rights may be, of the grandmother. In either event the decision must cause pain and disappointment.

While it is generally true that the father should have control of his child, the law looks to the facts in each case, and looks to the child's peace and happiness, rather than to indulging in fanciful theories about every father loving his child, and regardless of circumstances, entitled to its custody. The interests of society and the established policy of the law makes the welfare of the child paramount to the claims of the parent. Schouler on Domestic Relations, section 248. As laid down in *Richards* v. *Collins*, 45 N. J. Eq. 283, where parents have for a length of time voluntarily allowed their children to live in the family of another, and thus form home associations and ties of affections for those having their care and nurture, and when it would mar the happiness of the children to sever such ties, a claim for the custody of them by the father will be denied. This is fairly representative of the holdings of the other American courts. *Green* v. *Campbell*, 35 W. Va. 698; *Cunningham* v. *Barnes*, 37 W. Va. 746; *Merritt* v. *Swimley*, 82 Va. 433; *Clark* v. *Bayer*, 32 Ohio St. 299; *Bonnett* v. *Bonnett*, 61 Iowa 199; *Jones* v. *Darnall*, 103 Ind. 569.

In *Green* v. *Campbell*, *supra*, where a father gave his sixteen months old child on the death of its mother to its grandparents, who kept it until it was about five years old, this Court refused to give the custody to the father. Judge Holt there said: "This little boy, now nearly five years old, is

himself, no doubt, attached to his grandmother—he has known no other mother. * * * Human nature and human experience are parts of the common law; there is no need that this child should speak. * * * What fact appears in the record that would induce us to drag him away to the home of a stranger, of a young married woman, good and amiable, in every way worthy of high esteem, but none the less a stranger, the mistress of a strange home, and likely, in course of nature, soon to have about her those dearer to her than her own self." And later in *Cunningham* v. *Barnes, supra,* where a child fifteen months of age at the death of the mother was placed in the custody of its grandparents by the father was sought to be recovered by him when the child was seven, this Court, speaking through JUDGE ENGLISH, said: "It is clear that the attachments of this child are with its grandparents, where she has been kindly nurtured and cared for in sickness and in health, and her best interests would be promoted by allowing her to remain in their custody." The Supreme Court of Virginia, in the case of *Merritt* v. *Swimley, supra,* refused to restore the custody of an infant of twelve years to her father, where he transferred her custody before she was a month old, to female relatives, who tenderly nursed her in happy contentment until she was twelve years of age. So, we see that the period during which a child has been in the care of another than the parent is always an important element in determining what is best for it.

As to what may be considered the best interests of a child each case must be determined upon its own peculiar facts and circumstances. Possibly the clearest and most comprehensible rule for the guidance of courts in dealing with relations so delicate, was enunciated in the case of *Timothy Green,* heard and determined in the Circuit Court of United States, and reported in 3 Masons Reports, 485. There, the father sought to take his ten year old son from the custody of the grandmother, where it had been placed by the father some years before on the death of the mother. The court refused to change the custody. The eminent jurist Chief Justice Story of the Supreme Court of the United States said: "When, therefore, the court is asked to lend its aid to put

the infant into the custody of the father, and to withdraw him from other persons, it will look into all the circumstances, and ascertain whether it will be for the real, permanent interests of the infant; and if the infant be of sufficient discretion, it will also consult its personal wishes. * * * It is an entire mistake to suppose the court is at all events bound to deliver over the infant to his father, or that the father has an absolute vested right in the custody.'' This has been followed in the Virginias. When the child shows sufficient capacity mentally to exercise an intelligent choice, the court will, ordinarily, consult his wishes in the matter. Church on Habeas Corpus, section 443. Children between the ages of seven and fourteen years are often interrogated as to their wishes, and, if of sufficient intelligence, allowed to choose for themselves. *Cunningham* v. *Barnes, supra; McDoweles Case*, 8 John. (N. Y.) 328; *Hammond's Case*, 10 Pick. (Mass.) 274.

In the instant case the parental authority had been solemnly renounced for over seven long years—years most impressionable in the life of the child. Much as a court might desire to do so, I do not think it should attempt to cement the tie broken by the parent, unless it can say that it is to the best interests of the child to do so. The child here has had, and has today, all that a mother's love and care can give. From the time he was three and one-half years of age, the grandmother has been the only person he has really known as his mother, and the only person in the world who loved him, cared for him and treated him as a mother; and his heart and affection has gone out to her and now clings to her above all others and to the exclusion of all others, even to the father and the mother. The affection which a mother may have and does have, springing from the fact that her child is her offspring, is an affection which perhaps no other one can really possess; but so far as it is possible, springing from years of patient care of a little, helpless child of three, from association, and as an outgrowth from those little cares and motherly attentions bestowed upon it, an affection for the child. is seen in the grandmother that can be found nowhere else. And it is apparent that so far as a mother's love can be equalled, the grandmother here has that love, and will continue to have it.

Her association with the boy for over seven years, together with the tie of blood, has given to the boy an attachment which the wife of the relator, although a most estimable woman, will be unlikely to ever possess in an equal degree. A great poet has said: ''The bearing and training of a child is a woman's wisdom.''

The boy Joseph, who is an unusually precocious youth, has expressed a desire to remain with his grandmother. And, as we have shown, the wishes of children of sufficient capacity to form them are given especial consideration, where the parents have for a length of time allowed their children to live in the family of others. *Richards* v. *Collins, supra.* Can we against the expressed wishes of this bright boy hold it to be for his best interest to remove him from his present happy environment? Taking for granted that the father here possesses the filial devotion so well portrayed in the concurring note, he voluntarily, whether necessary or otherwise, put his child into the custody of the grandmother, thus recognizing that for at least the time being she was more capable than himself of taking care of it. He allowed it to gain a stronghold in her heart's affections and conversely the child to form an attachment for the grandmother as deep and everlasting as the love of child for mother. After the affection of both child and grandmother become engaged, and a state of things has arisen which cannot be altered without risking the happiness of the child, the general spirit of modern adjudged cases, both in England and America, is that the father is not in a position to have the interference of a court in his favor. His parental rights must yield to the feelings, interests and rights of other parties acquired by his consent. *Clark* v. *Bayer, supra.*

Oftimes parental love is measured by self-abnegation. This is the acid test when circumstances require the application of this spirit for the welfare of his offspring. Ought not a sense of parental duty withhold a parent from pressing his claims to the custody of his child, whenever the true interests of such child forbid it? Whenever, however, such parental obligation fails to influence the conduct of the parent, it is fortunate that the enlightened principles of our law authorizes

our courts to interpose in behalf of the child. What true parent can object that the welfare of the child shall be deemed paramount to the rights of either claimant? This is the profession of each claimant in this case, and neither should condemn the practical operation of the rule.

At the risk of repetition the real question before us is not what are the rights of either claimant, or whether the right of one be superior to that of the other, but what are the rights of the child? This cannot be considered as a question involving the right of property in the child. "The true view is," says the Virginia court in *Merritt* v. *Swimley, supra,* "that the rights of the child are first to be considered, and those rights are clearly to be protected in the enjoyment of his personal liberty, according to his own choice, if arrived at the age of discretion, and if not, to have its personal safety and interests guarded and secured by the law, acting through the agency of those who are called on to administer it." In the present case I would give great weight to the wishes and choice of the child, who appeared to me from personal observation at the hearing to be of sufficient age and judgment to exercise this discretion. In so doing, I am not merely acting in accordance with the ruling of the courts of the land, but exercising my sound judgment as a parent and as a man, fairly conversant with human nature through long contact with the public as a teacher, lawyer and judge.

I attach no evidential value to the testimony that has crept into this record challenging the fitness of either contender for the custody of the boy. This crimination and recrimination is merely the natural outgrowth of this character of litigation. It is better for the boy and all concerned that it be forgotten. I am not impressed with the point made on the hearing that the act of the grandmother in rendering an account for the care of the child was a recognition of the fact that there had been in fact no relinquishment to her of the custody of the boy by the father. This claim for compensation on her part was made while she was under the stress of mind occasioned by the sudden demand upon her to yield up the boy, and before she had been advised of her legal rights. It was only a gesture in the dark in her desperation to take some action

in the hope of causing the father to withdraw his demand. The fact that the father contributed to the support of his child, as shown by his checks brought into this proceeding *in extenso,* does not lend any appreciable support to the view that there was no contract. Admitting that every check listed was given for the boy's support (which is very improbable), the total thereof amounts to a mere pittance, when we consider the period of time Joseph remained in the grandparents' home. It surely would not be contended that such contribution showed that he had not relinquished his custody over the child. Rather does it not strongly tend to establish the contrary? The amount is no more than any father (of the shown financial worth of the relator), who loved his child, would invest the one who was acting as the mother of his offspring, through its tender years, as an honorarium. It is not to be expected that his interest in it would cease, even though he had bestowed its custody upon another. But be that as it may, whether or not there was any such contract is immaterial to the situation here, where in fact the father voluntarily allowed his child to remain in the grandmother's house for years thereby permitting it to effect attachments which would cause it naturally to attorn to that home. It is not that there was such contract, but it is the condition thus created to which the court should look and give effect in the proper exercise of its discretion.

I will not further protract this dissent. There is not in my judgment a case before us that can justify a removal of this boy from the custody in which we find him, one—we repeat—made by the act of the father. There are too many possibilities for good and service to humanity wrapped up in this bright boy, in this favored land of ours, to risk any change of environment at this critical age '' 'twixt boy and youth''. On the contrary, I cannot bring myself to believe, under the circumstances of this case, but that his interests will be better subserved by leaving his custody to remain *in status quo,* the father having all reasonable access to his child when he so desires. The ruling and analogies to be found in the cases in my opinion fully vindicate this conclusion.