665 S.E.2d 300

**In re Abbigail FAYE B.**

**No. 33716.**

Supreme Court of Appeals of West Virginia.

Submitted April 16, 2008.

Decided May 23, 2008.

Noel M. Olivero, Sammons, Olivero & Par-aschos, P.L.L.C., Huntington, WV, for the Appellants, Gala P. and Brent P.

Richard L. Vital, Barboursville, WV, for the Appellees, Joshua S. and Autumn S.

Robert E. Wilkinson, Chief Public Defender, Huntington, WV, Guardian ad Litem for the Minor Child, Abbigail Faye B.

DAVIS, Justice:

The appellants herein and petitioners below, Gala P. (hereinafter "Gala")[1] and Brent P. (hereinafter "Brent"), appeal from an order entered July 9, 2007, by the Circuit Court of Cabell County. By that order, the circuit court denied the petitioners' request for guardianship of their minor grandchild, Abbigail Faye B. (hereinafter "Abbigail"), and returned the child's custody to her biological parents, Autumn S.B. (hereinafter "Autumn") and Josh B. (hereinafter "Josh"). On appeal to this Court, Gala and Brent contend that the circuit court erred by concluding that they had failed to meet their burden of proving that (1) Abbigail was abused or neglected and that (2) Autumn was not capable of being a fit parent. The appellants argue further that the circuit court's order denying their request for Abbigail's guardianship is contrary to her welfare and best interests. Upon a review of the parties' arguments, the pertinent authorities, and the record designated for appellate consideration, we affirm the decision of the Cabell County Circuit Court.

## I.

### FACTUAL AND PROCEDURAL HISTORY

The underlying facts are largely undisputed by the parties. The minor child at issue in these proceedings, Abbigail Faye B., was born on August 3, 2006, to Autumn S. and Josh B. At the time of the child's birth, Autumn was seventeen years old[2] and resided with her mother, Gala, and her stepfather,

Brent. Josh, who was also approximately seventeen years old at that time, resided on the property of Gala and Brent in rooms located above their shop. Abbigail's birth certificate did not list Josh as her father, and the parties disagree as to the reason for this: Gala suggests that Autumn did not want to list Josh as the child's father for fear she would lose custody, while Autumn represents that Gala would not allow her to list Josh's name as the baby's father. In any event, Josh ultimately acknowledged paternity in February 2007.

Approximately three weeks after Abbigail was born, Autumn and Josh attended a family reunion in Paducah, Kentucky, leaving Abbigail in the care of Gala and Brent.[3] Upon returning from that trip, Autumn claimed that Josh had raped her while they were in Kentucky, but she later recanted. Also following their return, Josh moved off of Autumn's parents' property. Autumn subsequently returned to high school and continued to reside with her parents.

From the beginning of Abbigail's young life, Gala and Brent appear to have played a very active role in taking care of their grandchild. Although Autumn resided in their home, it seems that she relied heavily upon her parents to help her with Abbigail's care or to actually provide such care for her. Autumn's grandmother, Alice F. (hereinafter "Alice"), also provided substantial care for Abbigail. While Autumn attended high school,[4] Gala and Alice would care for Abbigail. Gala contends that she did not believe that Autumn was properly looking after Abbigail's health concerns and states that when Autumn and Josh went to Kentucky, she decided to take over. The record indicates

---

**1.** In light of the Legislature's admonition that the records of guardianship proceedings shall remain confidential and the sensitive nature of the facts involved in this case, we will refer to the parties by their last initials rather than by their full last names. *See* W. Va.Code § 44–10–3(e) (2006) (Supp.2007) (directing that, "[o]ther than court orders and case indexes, all other records of a guardian proceeding involving minor children are confidential"); *In re Cesar L.,* 221 W.Va. 249, 252 n. 1, 654 S.E.2d 373, 376 n. 1 (2007) (observing that, "[i]n light of the sensitive nature of the facts at issue in this proceeding, we follow our prior practice in similar cases and refer to

the parties by their last initials" (citation omitted)).

**2.** Autumn's birth date is December 2, 1988.

**3.** Autumn indicated that she had planned to take Abbigail on this trip with her, but because Abbigail had a severe case of thrush, Gala and Brent had said they would care for Abbigail and encouraged Autumn to continue with her travel plans.

**4.** *See* note 9, *infra.*

that Abbigail had various health issues, including gastroesophageal reflux disease, problems with her right leg which required physical therapy, and auditory and tactile sensory issues that affected her ability to tolerate new textures and impacted her willingness to eat a variety of foods. Gala suggests that even though Abbigail had these various medical conditions, Autumn did not actively participate in her special feeding routine or follow through with Abbigail's therapy at home.[5] Gala also indicates that Josh did not heed Abbigail's feeding requirements and often played with her inappropriately following her feedings by holding her upside down and not holding her upright for thirty minutes after she had eaten. Additionally, Gala reports that Josh had very limited interaction with Abbigail and often just stared at the child without talking to her or touching her.

In the early morning hours of February 20, 2007, Autumn moved out of her parents' home without their knowledge; Autumn left Abbigail in Gala and Brent's care while she established a new residence. On that same date, Autumn filed a domestic violence petition in the Magistrate Court of Cabell County on behalf of Abbigail and against Gala alleging that Gala would not return Abbigail to her. Also on February 20, 2007, Gala filed a pro se petition for appointment of guardian, pursuant to W. Va.Code § 44–10–3 (2006) (Supp.2007), in the Circuit Court of Cabell County, alleging that "Mother has ranaway [sic] & left the baby Abbigail with the materal [sic] Grandparents. The where abouts [sic] of the mother are unknown." The next day, February 21, 2007, Gala filed a domestic

violence petition in the Magistrate Court of Cabell County on behalf of Abbigail and against Autumn. Thereafter, Gala and Brent obtained counsel and, by counsel, filed an amended petition for guardianship on March 1, 2007, which amendments include allegations of the abuse and neglect of Abbigail by Autumn and Josh. Among other things, the amended guardianship petition included allegations that Autumn and Josh were not fit parents because they refuse to acknowledge Abbigail's various medical conditions and neither of them has a valid driver's license; since the child's birth, Autumn has twice "left the home and abandoned the child to the grandparents"; Autumn has accused Josh of being violent towards her and raping her; and Josh allegedly uses illegal drugs and "has a significant criminal history."

All three of these cases, the two domestic violence petitions filed in magistrate court and the petition for guardianship filed in circuit court, were referred to the Family Court of Cabell County and heard together on February 27, 2007.[6] A Guardian ad Litem was appointed for the minor child, and a hearing was held in the family court on March 2, 2007, after which the court entered an order. In its order of March 2, 2007, the family court awarded temporary custody of Abbigail to Gala and Brent and, as a result of the allegations of abuse and neglect contained in the amended petition for guardianship, continued and removed the case to the Circuit Court of Cabell County[7] and further referred the matter to the Child Protective Services Division of the Department of Health and Human Resources (hereinafter

---

5. During this time, Abbigail and Autumn were receiving services through the West Virginia Birth to Three program and Team for West Virginia Children.

6. Although not named as a party to the proceedings instituted in the family court, Josh acknowledged his paternity of Abbigail prior to the family court's first hearing and has participated in all proceedings in this matter, having been represented by counsel for Autumn.

7. Rule 48a(a) of the West Virginia Rules of Practice and Procedure for Family Court directs, in pertinent part,

 [i]f a family court learns that the basis, in whole or part, of a petition for infant guardian-

ship brought pursuant to W. Va.Code § 44–10–3, is an allegation of child abuse and neglect as defined in W. Va.Code § 49–1–3, then the family court before whom the guardianship proceeding is pending shall remove the case to the circuit court for hearing. Should the family court learn of such allegations of child abuse and neglect during the hearing, then the family court shall continue the hearing, subject to an appropriate temporary guardianship order, and remove the case to the circuit court for hearing to be conducted within 10 days, for determination of all issues.

For the complete text of Rule 48a and further discussion of its application to the case *sub judice*, see Section III.B., *infra*.

"CPS"). The family court also dismissed the two domestic violence petitions for lack of sufficient evidence to support the issuance of a domestic violence protective order as to either petition. In addition to these rulings, the parties represent that the family court, during the progress of the underlying hearing, also recognized Josh as a party to these proceedings [8] and granted supervised visitation to Autumn and Josh, although such rulings are not contained in the above-referenced order.

On April 26, 2007, CPS filed its investigation report. It concluded that Abbigail was not an abused or neglected child and that she did not need further CPS services while she remained in her grandparents' care. The CPS worker opined, however, that while Autumn and Josh had not abandoned Abbigail, there was a moderate risk of abuse and/or neglect if she were reunited with her parents. Thus, CPS suggested that if Autumn and Josh regained Abbigail's custody, community services be provided to them.

The circuit court then held hearings on May 7, 2007; May 25, 2007; and June 8, 2007.[9] By order entered July 9, 2007, the circuit court denied Gala and Brent's petition for guardianship of Abbigail

> find[ing] that the Petitioners [Gala and Brent] have failed to meet their burden in this matter to show that Abbigail Faye B[.] is an abused or neglected child as defined by the West Virginia Code, nor that Autumn S[.], the natural mother of Abbigail, is not capable of being a fit parent.

The court then placed Abbigail with her parents, Autumn and Josh,[10] through the use of a transitional period. Gala and Brent were awarded visitation with Abbigail. From this ruling, Gala and Brent appeal to this Court.

---

**8.** *See supra* note 6.

**9.** During these hearings, evidence was presented to show that Josh had had various arrests for traffic offenses and that he had illegally used alcohol and other drugs, which, in turn, led to at least one arrest for possession. It is unclear whether Josh has a current driver's license or if his license is still suspended. With respect to

## II.

### STANDARD OF REVIEW

In this case, we are asked to review the circuit court's order denying Gala and Brent's petition for guardianship of Abbigail. We previously have held, in cases seeking the custody of a child, that

> [t]he exercise of discretion by a trial court in awarding custody of a minor child will not be disturbed on appeal unless that discretion has been abused; however, where the trial court's ruling does not reflect a discretionary decision but is based upon an erroneous application of the law and is clearly wrong, the ruling will be reversed on appeal.

Syl. pt. 2, *Funkhouser v. Funkhouser*, 158 W.Va. 964, 216 S.E.2d 570 (1975), *superseded by statute on other grounds as stated in David M. v. Margaret M.*, 182 W.Va. 57, 385 S.E.2d 912 (1989). Moreover, to the extent that the circuit court's decision involved the interpretation and application of the guardianship statute, W. Va.Code § 44-10-3, to the facts of this case, our review is plenary. "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995). *Accord* Syl. pt. 1, *Appalachian Power Co. v. State Tax Dep't of West Virginia*, 195 W.Va. 573, 466 S.E.2d 424 (1995) ("Interpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review."). Guided by these standards, we proceed to consider the errors assigned by the parties.

## III.

### DISCUSSION

On appeal to this Court, Gala and Brent complain that the circuit court erred by re-

---

Autumn, evidence was introduced to show that she does not have a valid driver's license or learner's permit, and, when she moved out of her parents' house in February 2007, she quit high school and has not yet obtained her GED.

**10.** The record indicates that Autumn and Josh were married on July 4, 2007.

fusing their petition for guardianship of Abbigail. In ruling upon said petition, the circuit court concluded that the petitioners had not met their burden of proving that Abbigail was an abused or neglected child or that Autumn was not a fit parent. Assigning error to the circuit court's ruling, Gala and Brent contend that they sustained their burden of proving that Autumn is not a fit parent and that Abbigail's best interests would be served by awarding her guardianship to Gala and Brent. They further argue that the circuit court erred by requiring them to prove that Abbigail was an abused or neglected child. Both Autumn and Josh, as well as Abbigail's Guardian ad Litem, respond that Autumn and Josh are fit parents and that Abbigail's best interests would be promoted by returning her custody to her biological parents, Autumn and Josh. The Guardian ad Litem further contends that the circuit court did not err by requiring Gala and Brent to prove abuse and neglect by clear and convincing evidence insofar as their petition for guardianship contained such allegations and served as the impetus for removing the case from family court to circuit court in accordance with Rule 48a(a) of the West Virginia Rules of Practice and Procedure for Family Court.

### A. W. Va.Code § 44–10–3 (2006) (Supp.2007)

The case *sub judice* originated with the filing, by Gala and Brent, of a petition for the guardianship of Abbigail pursuant to W. Va. Code § 44–10–3 (2006) (Supp.2007).[11] This statute provides:

(a) The circuit court or family court of the county in which the minor resides, or if the minor is a nonresident of the state, the county in which the minor has an estate, may appoint as the minor's guardian a suitable person. The father or mother shall receive priority. However, in every case, the competency and fitness of the proposed guardian and the welfare and best interests of the minor shall be given precedence by the court when appointing the guardian.

(b) Within five days of the filing of a petition for the appointment of a guardian, the circuit clerk shall notify the court. The court shall hear the petition for the appointment of a guardian within ten days after the petition is filed.

11. Although it is apparent from the facts of this case that Gala and Brent actually were seeking to obtain physical custody of Abbigail, it was proper for them to proceed under the provisions of the guardianship statute, W. Va.Code § 44–10–3, as they did in this case. The statutory provisions relating to guardians and wards generally, W. Va.Code § 44–10–1, *et seq.*, have frequently been relied upon by this Court when making custodial determinations. *See, e.g.,* W. Va.Code § 44–10–4 (2004) (Repl.Vol.2004) (permitting child fourteen years of age or older to nominate his/her guardian); Syl. pt. 7, in part, *Garska v. McCoy,* 167 W.Va. 59, 278 S.E.2d 357 (1981) (holding that "an adolescent fourteen years of age or older ... has an absolute right under *W. Va.Code,* 44–10–4 [1923] to nominate his own guardian"). Moreover, those statutes dealing specifically with child custody, W. Va. Code § 48–9–101, *et seq.,* "set[ ] forth principles governing the allocation of custodial and decision-making responsibility for a minor child when the parents do not live together." W. Va.Code § 48–9–101(a) (2001) (Repl.Vol.2004). In the case *sub judice,* however, neither the biological parents' living arrangements nor their marital status was a precipitating factor for the filing of the guardianship petition. Rather, Gala and Brent averred that Autumn was not a fit parent and that Abbigail's best interests required that her guardianship be awarded to Gala and Brent. Additionally, since said petition was filed, Autumn and Josh have married each other and are residing together in the same household. Thus, the statutory provisions governing child custody determinations do not apply to the facts of this case. Finally, Autumn and Josh have argued that this case involves issues of grandparent visitation. It is clear from the record in this case and the arguments asserted by Gala and Brent that they did not file a petition for grandparent visitation but instead seek much greater privileges and responsibilities vis-a-vis Abbigail than the limited rights an award of grandparent visitation would grant them. *See generally* W. Va.Code § 48–10–101, *et seq.* Therefore, we will decide this case in accordance with the statutory provisions concerning the guardianship of minors. Because our case law has often treated custodial and guardianship terminology interchangeably, we will consider also those authorities addressing child custody when necessary to our consideration of the guardianship matters at issue herein. *See, e.g., Garska v. McCoy,* 167 W.Va. 59, 278 S.E.2d 357; *State ex rel. Cash v. Lively,* 155 W.Va. 801, 187 S.E.2d 601 (1972); *State ex rel. Kiger v. Hancock,* 153 W.Va. 404, 168 S.E.2d 798 (1969); *Whiteman v. Robinson,* 145 W.Va. 685, 116 S.E.2d 691 (1960).

(c) The court, the guardian or the minor may revoke or terminate the guardianship appointment when:

(1) The minor reaches the age of eighteen and executes a release stating that the guardian estate was properly administered and that the minor has received the assets of the estate from the guardian;

(2) The guardian or the minor dies;

(3) The guardian petitions the court to resign and the court enters an order approving the resignation; or

(4) A petition is filed by the guardian, the minor, an interested person or upon the motion of the court stating that the minor is no longer in need of the assistance or protection of a guardian.

(d) A guardianship may not be terminated by the court if there are any assets in the estate due and payable to the minor: Provided, That another guardian may be appointed upon the resignation of a guardian whenever there are assets in the estate due and payable to the minor.

(e) Other than court orders and case indexes, all other records of a guardian proceeding involving a minor are confidential and shall not be disclosed to anyone who is not a party to the proceeding, counsel of record for the proceeding or presiding over the proceeding absent a court order permitting examination of such records.

*Id.*

In order to assess the correctness of the circuit court's order denying Gala and Brent's petition for guardianship, we must first consider the language of the statute under which Gala and Brent filed their petition and upon which the lower tribunal based its ruling. "The primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syl. pt. 1, *Smith v. State Workmen's Comp. Comm'r,* 159 W.Va. 108, 219 S.E.2d 361 (1975). After considering the legislative intent, we next must examine the precise words used by the Legislature. "A statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect." Syl. pt. 2, *State v. Epperly,* 135 W.Va. 877, 65 S.E.2d 488 (1951). *See also DeVane v. Kennedy,* 205 W.Va. 519, 529, 519 S.E.2d 622, 632 (1999) ("Where the language of a statutory provision is plain, its terms should be applied as written and not construed." (citations omitted)); Syl. pt. 5, *State v. General Daniel Morgan Post No. 548, V.F.W.,* 144 W.Va. 137, 107 S.E.2d 353 (1959) ("When a statute is clear and unambiguous and the legislative intent is plain, the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute."). *But see* Syl.pt. 1, *Farley v. Buckalew,* 186 W.Va. 693, 414 S.E.2d 454 (1992) ("A statute that is ambiguous must be construed before it can be applied."); Syl. pt. 1, *Ohio County Comm'n v. Manchin,* 171 W.Va. 552, 301 S.E.2d 183 (1983) ("Judicial interpretation of a statute is warranted only if the statute is ambiguous and the initial step in such interpretative inquiry is to ascertain the legislative intent.").

The operative language of W. Va.Code § 44–10–3 that is at issue in this case is set forth in subsection (a):

The circuit court or family court of the county in which the minor resides, or if the minor is a nonresident of the state, the county in which the minor has an estate, may appoint as the minor's guardian a suitable person. The father or mother shall receive priority. However, in every case, the competency and fitness of the proposed guardian and the welfare and best interests of the minor shall be given precedence by the court when appointing the guardian.

We have had few prior occasions upon which to consider this statutory language. Most of our prior opinions citing W. Va.Code § 44–10–3 have done so only in passing while discussing guardian-ward relationships in general rather than giving this statute in-depth treatment. *See, e.g., Glen Falls Ins. Co. v. Smith,* 217 W.Va. 213, 222, 617 S.E.2d 760, 769 (2005); *In re Clifford K.,* 217 W.Va. 625, 637, 619 S.E.2d 138, 150 (2005); *Idleman v. Groves,* 89 W.Va. 91, 95–96, 108 S.E. 485, 486–87 (1921). *See also Provident Life & Accident Ins. Co. v. Little,* 88 F.Supp.2d

604, 608 (S.D.W.Va.), *aff'd,* 238 F.3d 414 (4th Cir.2000) (unpublished table decision).

However, in the case of *In re Custody of Woolfolk,* 170 W.Va. 238, 293 S.E.2d 316 (1982) (per curiam), this Court specifically did ·address the language of W. Va.Code § 44–10–3 in rendering its decision. *Woolfolk* involved the distinction between a minor child's two guardians: one who was appointed as "guardian of the [minor child's] property," 170 W.Va. at 238, 293 S.E.2d at 316 (internal quotations and citation omitted), and one who, being the child's natural father, was appointed for "the sole purpose of . . . giv[ing] permission for medical treatment for said infant," 170 W.Va. at 239, 293 S.E.2d at 317 (internal quotations and citation omitted). In determining the scope of each guardian's authority over the child, the Court considered W. Va.Code § 44–10–3 and held, in the sole Syllabus point, that

"[t]he county court of any county in which any minor resides . . . may . . . appoint as guardian for him some suitable person, preferring first the father or the mother; but in every case the competency and fitness of the person, and the welfare and best interest of the minor, shall govern the court in making the selection." *W. Va.Code,* 44–10–3 (1923).

170 W.Va. 238, 293 S.E.2d 316.

■ While directly on point with the facts and issues involved in the instant appeal, this syllabus point is somewhat problematic, though, insofar as it was adopted in a per curiam opinion. We previously have held that "[t]his Court will use signed opinions when new points of law are announced and those points will be articulated through syllabus points as required by our state constitution." Syl. pt. 2, *Walker v. Doe,* 210 W.Va. 490, 558 S.E.2d 290 (2001). Thus, it is apparent that the announcement of a new point of law regarding W. Va.Code § 44–10–3 should have occurred in a signed opinion and not in a per curiam opinion such as was the case in *Woolfolk.* Comparing the version of W. Va.Code § 44–10–3 that was at issue in *Woolfolk* with the legislative amendments to that section that have been adopted since our decision therein, we find the differences to be only slight and not demonstrative of a sub-

stantial change in the fundamental meaning or intent of that statute. We further conclude that the language employed in the current version of W. Va.Code § 44–10–3 is plain and does not require further construction. Therefore, consistent with our prior decision in *Woolfolk* but in keeping with the present statutory language, we hold that, pursuant to the plain language of W. Va. Code § 44–10–3(a) (2006) (Supp.2007), the circuit court or family court of the county in which a minor resides may appoint a suitable person to serve as the minor's guardian. In appointing a guardian, the court shall give priority to the minor's mother or father. "However, in every case, the competency and fitness of the proposed guardian and the welfare and best interests of the minor shall be given precedence by the court when appointing the guardian." W. Va.Code § 44–10–3(a).

### B. Allegations of Child Abuse and Neglect in Guardianship Petitions

■ In applying W. Va.Code § 44–10–3(a) to determine whether Gala and Brent should be appointed as Abbigail's guardians, the circuit court also incorporated the clear and convincing standard of proof applicable to abuse and neglect proceedings. *See* W. Va. R. Prac. & Proc. for Fam. Ct. 48a(a) ("[A]llegations of child abuse and neglect must be proven by clear and convincing evidence."). *See also* W. Va.Code § 49–6–2(c) (2006) (Supp.2007) (requiring the findings of abuse and neglect must be "proven by clear and convincing proof"); Syl. pt. 3, *In re Randy H.,* 220 W.Va. 122, 640 S.E.2d 185 (2006) (" '*W. Va.Code,* 49–6–2(c) [1980], requires the State Department of Welfare [now the Department of Health and Human Resources], in a child abuse or neglect case, to prove "conditions existing at the time of the filing of the petition . . . by clear and convincing proof." The statute, however, does not specify any particular manner or mode of testimony or evidence by which the State Department of Welfare is obligated to meet this burden.' Syllabus Point 1, *In Interest of S.C.,* 168 W.Va. 366, 284 S.E.2d 867 (1981)."). Although either the family court or the cir-

cuit court of the county in which the minor resides may hear a petition for guardianship, W. Va.Code § 44–10–3(a), if the petition is filed in the family court and contains allegations of abuse and neglect, Rule 48a(a) of the West Virginia Rules of Practice and Procedure for Family Court requires the proceeding to be transferred to the circuit court and further requires the circuit court, in turn, to apply the clear and convincing standard of proof that is applicable to abuse and neglect cases generally.

Rule 48a directs:

(a) *Removal by family court to circuit court of infant guardianship cases involving child abuse and neglect.*—If a family court learns that the basis, in whole or part, of a petition for infant guardianship brought pursuant to W. Va.Code § 44–10–3, is an allegation of child abuse and neglect as defined in W. Va.Code § 49–1–3, then the family court before whom the guardianship proceeding is pending shall remove the case to the circuit court for hearing. Should the family court learn of such allegations of child abuse and neglect during the hearing, then the family court shall continue the hearing, subject to an appropriate temporary guardianship order, and remove the case to the circuit court for hearing to be conducted within 10 days, for determination of all issues. At the circuit court hearing, allegations of child abuse and neglect must be proven by clear and convincing evidence. Immediately upon removal, the circuit clerk shall forthwith send the removal notice to the circuit court. Upon receipt of the removal notice, the circuit court shall forthwith cause notice to be served in accordance with W. Va.Code § 44–10–3 and to the Department of Health and Human Resources who shall be served with notice of the petition, including a copy of the petition, and of the final hearing to be conducted before the circuit court. Such notice to the Department of Health and Human Resources shall constitute a report by the family and circuit courts pursuant to W. Va.Code § 49–6A–2.

(b) *Investigation of abuse and neglect.*—Upon removal of the infant guard-ianship petition, the circuit court may utilize the investigative and mandamus process and related procedures set forth in Rule 3a of the Rules of Procedure for Child Abuse and Neglect Proceedings if the court deems it necessary or appropriate under the circumstances presented. The circuit court shall allow the petitioner for infant guardianship to appear as a co-petitioner on the petition filed by the Department of Health and Human Services pursuant to W. Va.Code § 49–6–1, et seq., or a prohibition against the filing of a W. Va.Code § 49–6–1, et seq., petition by the petitioner for infant guardianship should the Department show cause why it will not file such a petition.

■ At issue herein is the language contained in subsection (a) requiring a family court to remove guardianship cases alleging child abuse and neglect to the circuit court for further proceedings. Reading this rule in conjunction with the language of W. Va.Code § 44–10–3, we find the directives to be clear. Accordingly, we hold that Rule 48a(a) of the West Virginia Rules of Practice and Procedure for Family Court requires that if a family court presiding over a petition for infant guardianship brought pursuant to W. Va.Code § 44–10–3 learns that the basis for the petition, in whole or in part, is an allegation of child abuse and neglect as defined by W. Va.Code § 49–1–3, then the family court is required to remove the petition to circuit court for a hearing thereon. Furthermore, "[a]t the circuit court hearing, allegations of child abuse and neglect must be proven by clear and convincing evidence." West Virginia Rules of Practice and Procedure for Family Court 48a(a).

The initial guardianship petition filed pro se by Gala and Brent alleged as grounds therefor that "Mother has ranaway [sic] & left the baby Abbigail with the materal [sic] Grandparents. The where abouts [sic] of the mother are unknown." After obtaining counsel, Gala and Brent filed an amended petition for guardianship alleging, in part, that since the child's birth, "the biological mother, Autumn S[.], has lived in the home [of Gala and Brent] but on two occasions since the child's birth, she has left the home and abandoned

the child to the grandparents." Both of these petitions were filed in the Circuit Court of Cabell County, assigned to the Family Court of Cabell County, and, following a hearing thereon, removed to the circuit court based upon the allegations of abuse and neglect contained therein. Despite these allegations in the lower tribunals, on appeal to this Court, Gala and Brent vehemently argue that Abbigail was not an abused and neglected child while she was in their care, and that, consequently, the circuit court erred by applying the clear and convincing burden of proof. Their argument fails to appreciate, however, that the issue is not whether Abbigail was abused and neglected while she was in *their* care, but rather whether she was abused and neglected while she was in *Autumn's* care. It goes without saying that persons accused of abusing and neglecting a child would have no business petitioning a court to be that child's guardian. Rather, the operative inquiry is whether the person from whom the petitioners are attempting to wrest the child's guardianship has committed such malfeasance; here, because Gala and Brent are seeking to obtain guardianship by divesting Autumn of the same, the question is whether Abbigail suffered abuse and neglect while in Autumn's care. Therefore, we must determine whether the allegations contained in Gala and Brent's amended petition for guardianship rose to the level of allegations of abuse and neglect such that the circuit court was required to review the evidence under the clear and convincing standard.

■ The phrase used in Rule 48a(a), "child abuse and neglect," is defined by W. Va.Code § 49-1-3(d) (2006) (Supp.2006) [12] as "physical injury, mental or emotional injury, sexual abuse, sexual exploitation, sale or attempted sale or negligent treatment or maltreatment of a child by a parent, guardian or custodian who is responsible for the child's welfare, under circumstances which harm or

threaten the health and welfare of the child." Here, Gala and Brent alleged in both their initial and amended petitions for guardianship that Autumn had abandoned her child. Either of these allegations, apart from several of the other allegations contained in the petitions, is suggestive of "negligent treatment ... of a child by a parent ... who is responsible for the child's welfare, under circumstances which harm or threaten the health and welfare of the child," W. Va.Code § 49-1-3(d), because an infant who was either three weeks old, at the time Autumn went to Paducah, Kentucky, or who was six months old, at the time Autumn left her parents' home, was incapable of caring for him/herself.[13] In light of these allegations, the family court correctly removed the petition to the circuit court for further proceedings. Furthermore, because the guardianship petition alleged that the subject child had been abused and neglected, the circuit court was obligated to consider the evidence presented in accordance with the standard of proof for abuse and neglect cases generally, *i.e.*, clear and convincing evidence, and it correctly did so. *See* W. Va. R. Prac. & Proc. for Fam. Ct. 48a(a). Consequently, we do not find that the circuit court erred in this regard.

### C. Parental Priority if Competent and Fit

Turning now to the circuit court's rulings denying Gala and Brent's petition for guardianship, W. Va.Code § 44-10-3(a) permits a court to appoint a guardian for a minor child if the proposed guardian is competent and fit, but requires the court to accord priority to the child's mother or father. *See* W. Va. Code § 44-10-3(a) ("The father or mother shall receive priority."). Under the facts of the case *sub judice*, the circuit court determined that "the Petitioners [Gala and Brent] have failed to meet their burden in this mat-

---

**12.** Since the time of the events at issue in the case *sub judice*, W. Va.Code § 49-1-3 has been amended. However, those amendments do not affect the statutory language considered in this opinion. *Compare* W. Va.Code § 49-1-3 (2006) (Supp.2006) *with* W. Va.Code § 49-1-3 (2007) (Supp.2007).

**13.** As will be discussed in greater detail in Section III.C., *infra*, although these allegations raise a red flag that abuse and neglect has been alleged such to require removal of the guardianship petition from family court to circuit court, we do not find that Autumn abused and neglected Abbigail.

ter to show ... that Autumn S[.], the natural mother of Abbigail, is not capable of being a fit parent." Before this Court, Gala and Brent argue that they offered sufficient proof of Autumn's unfitness, including her lack of bonding with Abbigail and her unwillingness to help with child care duties, such that they should have been awarded Abbigail's guardianship. We disagree.

Divesting a child's biological parent of his/her guardianship, or custody,[14] is a very serious matter. This Court repeatedly has recognized the inherent rights parents have to the custody of their own children, and any party seeking to interfere with such rights must bear a heavy burden. In our earliest cases on the subject, we adopted the then-prevailing views evidencing a presumption in favor of the child's father. For example, in Syllabus point 3 of *Green v. Campbell*, 35 W.Va. 698, 14 S.E. 212 (1891), we held that "[t]he father is the natural guardian of his infant children, and, in the absence of good and sufficient cause shown, is entitled to their custody." *Accord* Syl. pt. 2, *Hurley v. Hurley*, 71 W.Va. 269, 76 S.E. 438 (1912) ("The father is legally entitled to the custody of his infant child, if fit for the trust, and the same should not be denied him unless the child's welfare or other considerations clearly outweigh his legal right."); Syl. pt. 3, in part, *Mathews v. Wade*, 2 W.Va. 464 (1868) ("By the Code of Virginia, 1860, a lawfully appointed guardian has the custody of his ward ... but the father of the minor, if living, and in case of his death, the mother, while she remains unmarried, shall, if fit for the trust, be entitled to the custody of the person of the minor[.]"). As our law evolved, we gradually appreciated the corresponding rights of a child's mother to the custody of her child: "With reference to the custody of very young children, the law favors the mother if she is a fit person, other things being equal...." Syl. pt. 2, in part, *Settle v. Settle*, 117 W.Va. 476, 185 S.E. 859 (1936), *superseded by statute as stated in David M. v. Margaret M.*, 182 W.Va. 57, 61, 385 S.E.2d 912, 916 (1989) (recognizing that 1980 amendments to W. Va.Code § 48–2–15 (1980) (Repl.Vol.1980) and prior decision in *Garska v. McCoy*, 167

W.Va. 59, 70, 278 S.E.2d 357, 363 (1981), "abolished the gender-based presumption" of "maternal preference" in child custody matters).

▮ Through the continued development of the law in this area, though, we gradually recognized parental rights as more generally applicable to either parent. One of our first such cases defining the scope of such parental rights is *Whiteman v. Robinson*, 145 W.Va. 685, 116 S.E.2d 691 (1960), in which we held, in the single Syllabus point:

A parent has the natural right to the custody of his or her infant child and, unless the parent is an unfit person because of misconduct, neglect, immorality, abandonment, or other dereliction of duty, or has waived such right, or by agreement or otherwise has transferred, relinquished or surrendered such custody, the right of the parent to the custody of his or her infant child will be recognized and enforced by the courts.

*Accord* Syl., *State ex rel Kiger v. Hancock*, 153 W.Va. 404, 168 S.E.2d 798 (1969). We also have appreciated that such rights are not just constructs of the courts, but that they are basic liberties secured by the state and federal constitutions:

In the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions.

Syl. pt. 1, *In re Willis*, 157 W.Va. 225, 207 S.E.2d 129 (1973).

▮ The facts of this case, like many of our domestic law cases, suggest a familial situation in which a child is fortunate to have many people who love her and who want to take care of her. While a child may have many different types of caretakers, only a select few may be awarded his/her guardianship. We appreciate the concerns of Gala and Brent regarding their perceptions of Au-

---

14. *See supra* note 11.

tumn's and Josh's abilities to parent their child. Nevertheless, the relief they seek is not a remedy that we bestow lightly. Although there are circumstances in which parents should not serve as the guardians for their child(ren), the vast majority of those cases are handled through the child abuse and neglect process to ensure that parents' rights are not unnecessarily trammeled.

In the case *sub judice*, the circuit court heard testimony presented both by Gala and Brent and by Autumn and Josh, and was charged with assessing the credibility of the various witnesses. Having reviewed the transcripts of those hearings, we agree with the circuit court's assessment of the evidence and its ultimate conclusion that Autumn is capable of being a fit parent. The standard by which we typically determine parental fitness is that set forth in *Whiteman v. Robinson*, which directs a court to consider the following factors: "misconduct, neglect, immorality, abandonment, or other dereliction of duty, or has waived such right, or by agreement or otherwise has transferred, relinquished or surrendered such custody." Syl., 145 W.Va. 685, 116 S.E.2d 691. Applying these factors to the facts before us, there do not appear to be any allegations that Autumn is guilty of misconduct or immorality, that she has waived her parental rights, or that she has transferred, relinquished, or surrendered custody of Abbigail.

 With respect to Gala and Brent's allegations that Autumn had twice abandoned her child, we do not find that those two instances are sufficient to divest Autumn of Abbigail's guardianship. On the first alleged occasion of abandonment, it appears that Autumn and Josh had planned a trip to a family reunion and that they had planned to take Abbigail with them. However, at the time of their departure, Abbigail was sick, and it appears that Autumn was encouraged to proceed with her travel plans while Gala and Brent cared for Abbigail.[15] It goes without saying that leaving a child in another's care after having made such care arrangements does not constitute abandonment. The second alleged instance of abandonment apparently followed a heated discussion be-

tween Autumn and Gala and Brent. It seems that Autumn moved out of her parents' residence and left Abbigail in their care until she could establish a new residence for herself and her daughter. Although she left earlier in the day than was customary, Autumn was, at this point, still attending high school and left Abbigail at the home of Gala and Brent and in their care on a daily basis. Moreover, Gala and Brent filed their petition for guardianship the same day that Autumn moved out. By filing their guardianship petition, the animosities between the parties undoubtedly had escalated such that Autumn likely would not have been permitted to remove Abbigail from Gala and Brent's home. We do not find this isolated incident, under the particular facts of this case, to be sufficient upon which to base a change of Abbigail's guardianship.

 Lastly, we do not find that Autumn either neglected Abbigail or that she was otherwise derelict in any other of her parental duties. Autumn was a new mother, and a relatively young new mother at that. She lived in her parents' home, and her grandmother lived next door. Autumn received substantial help from both her mother and her grandmother in caring for her child, and both Autumn's mother and grandmother provided a significant amount of care for Abbigail to allow Autumn to continue attending high school. However, when questioned during the hearings in this matter, both Autumn and Gala were critical of the other's participation in Abbigail's care: Autumn indicated that she was made to feel inadequate when attending to Abbigail's needs while Gala suggested that Autumn lacked initiative in caring for Abbigail. Absent further evidence to indicate that Autumn is not a fit and competent person to serve as Abbigail's guardian, we find the circuit court correctly accorded priority to Autumn, as Abbigail's mother, in determining the minor's guardianship and affirm the circuit court's ruling in this regard.

 As a final matter, we note that although Josh has participated in these proceedings, the initial guardianship petition

---

**15.** *See* note 3, *supra.*

was filed against Autumn only. Thus, it appears that the circuit court, in its final order, limited its ruling on parental fitness to apply only to Autumn even though the amended guardianship petition also challenged Josh's fitness as a parent. While the circuit court did not specifically state in its order that it also found Josh to be a fit and competent person to serve as Abbigail's guardian, neither did it find that Josh was unfit or incompetent to be the child's guardian. Nevertheless, Josh's fitness may be inferred from the court's inclusion of Josh in its plan of reunification insofar as it placed Abbigail with both of her parents. Upon a review of the record evidence, we reiterate our conclusion that not only was Autumn a relatively young new mother, but also Josh was a relatively young new father. We do not disagree that Josh's background is not perfect. Allegations of Josh's traffic citations, underage drinking, and use of marijuana are contained in the record. It also is apparent that there is much animosity between Gala and Brent and Josh, and that this acrimony may have prevented Josh from visiting and interacting with Abbigail while she resided in Gala and Brent's home. Be that as it may, Josh's participation in these guardianship proceedings since their commencement indicates a strong commitment on his part to participate in his child's life, and he has taken steps towards that end by marrying his child's mother and establishing a home for his family. While we are not unmindful of Josh's past transgressions, unless and until we are presented with more solid evidence indicating that he is not fit or competent to serve as Abbigail's guardian, we will accord him, as the child's father, the statutory preference mandated by W.Va. Code § 44–10–3(a).

### D. Welfare and Best Interests of Minor

According a preference to Abbigail's parents, Autumn and Josh, is not conclusive of our determination of Abbigail's guardianship unless such a placement also serves her "welfare and best interests," W. Va.Code § 44–10–3(a). The circuit court neglected to reference Abbigail's welfare and best interests in its final order, but, during its June 8, 2007, hearing, the court acknowledged that the

best interests of the child "must be the controlling factor" in rendering a decision in this case. Therefore, we will presume that the circuit court found that a denial of Gala and Brent's guardianship petition and that placement of Abbigail in Autumn's and Josh's care satisfied the child's welfare and best interests.

As we previously have indicated, even though parents have substantial rights in guardianship matters, so do the children involved. In fact, we specifically have held that, "[a]lthough parents have substantial rights that must be protected, the primary goal ... in all family law matters ... must be the health and welfare of the children." Syl. pt. 3, in part, In re Katie S., 198 W.Va. 79, 479 S.E.2d 589 (1996). Moreover, we typically have been reluctant to change a child's custodial placement unless such a change will materially promote the child's best interests. In one of this Court's earliest cases, we specifically recognized that the child's welfare is the dispositive factor in child custody matters: "But the court is in no case bound to deliver the child into the custody of any claimant, but may leave it in such custody as the welfare of the child at the time appears to require." Syl. pt. 4, Green v. Campbell, 35 W.Va. 698, 14 S.E. 212 (1891). Accord Syl. pt. 1, Frame v. Wehn, 120 W.Va. 208, 197 S.E. 524 (1938) ("' "In contest over the custody of an infant, the welfare of the child is the polar star by which the discretion of the court is to be guided." State ex rel. Palmer v. Postlethwaite, 106 W.Va. 383, 145 S.E. 738 [(1928)].' State ex rel. Cooke v. Williams, 107 W.Va. 450, 148 S.E. 488 [(1929)]; Reynolds v. Reynolds, 109 W.Va. 513, 155 S.E. 652 [(1930)]."). See also Syl. pt. 2, Cloud v. Cloud, 161 W.Va. 45, 239 S.E.2d 669 (1977) (per curiam) ("To justify a change of child custody, in addition to a change in circumstances of the parties, it must be shown that such change would materially promote the welfare of the child.").

Gala and Brent have argued at length that Abbigail's best interests would best be served by awarding them her guardianship. In support of their claims, Gala and Brent reference how much Abbigail has

bonded with them, how involved they have been in her therapy, and how a drastic change of her environment could wreak havoc on her delicate state in light of her numerous medical conditions.[16] We do not doubt that Gala and Brent could provide a fine home for Abbigail as they have already done so for Autumn and her siblings. Nevertheless, "[w]hile courts always look to the best interests of the child in controversies concerning his or her custody, such custody should not be denied to a parent merely because some other person might possibly furnish the child a better home or better care." Syl. pt. 3, *Hammack v. Wise,* 158 W.Va. 343, 211 S.E.2d 118 (1975).

 Here, we agree with the circuit court's assessment that Abbigail's best interests require her to be placed with her parents, Autumn and Josh. Although Abbigail has bonded significantly with Gala and Brent, she should also be afforded the opportunity to bond with her biological parents, Autumn and Josh. Simply because Gala and Brent have been in a position to provide substantial care for Abbigail, at times to the exclusion of Autumn and Josh, does not presumptively make them a better placement for Abbigail. The record before us suggests that Autumn and Josh also are capable of providing a suitable home for Abbigail. In fact, in response to the concerns raised in this case, the Child Protective Services Division of the West Virginia Department of Health and Human Resources conducted a preliminary investigation of Autumn and Josh, and their home, and did not find any conditions necessitating further proceedings. Absent evidence that Abbigail's safety would be endangered by awarding her guardianship to her parents, we cannot find any justification in the record to indicate that her welfare and best interests would not be served by placing her with her parents, Autumn and Josh, particularly in light of our prior findings that they are fit and competent to serve as her guardians and have, thus, been accorded a statutory preference pursuant to W. Va.Code § 44–10–3(a). Accordingly, we find that the circuit court did not abuse its discretion and affirm the lower court's ruling on this point.

16. *See* Section I, *supra.*

## IV.

## CONCLUSION

For the foregoing reasons, the July 9, 2007, order of the Circuit Court of Cabell County is hereby affirmed.

Affirmed.