IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2015 Term

**FILED**

**May 22, 2015**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 14-0403

D.B.
D.B.,
Petitioners

v.

J.R.,
Respondent

Appeal from the Circuit Court of Mingo County
The Honorable John L.Cummings, Judge
Civil Action No. 12-CIG-2

REVERSED AND REMANDED

Submitted: February 25, 2005
Filed: May 22, 2015

Jane Moran, Esq.                                    Timothy P. Lupardus, Esq.
Jane Moran Law Office                          Pineville, West Virginia
Williamson, West Virginia                     Counsel for the Respondent
Counsel for the Petitioners


Diana C. Wiedel, Esq.
Williamson, West Virginia
Guardian Ad Litem

CHIEF JUSTICE WORKMAN delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      ""'"The exercise of discretion by a trial court in awarding custody of a minor child will not be disturbed on appeal unless that discretion has been abused; however, where the trial court's ruling does not reflect a discretionary decision but is based upon an erroneous application of the law and is clearly wrong, the ruling will be reversed on appeal." Syllabus point 2, *Funkhouser v. Funkhouser*, 158 W. Va. 964, 216 S.E.2d 570 (1975), *superseded by statute on other grounds as stated in David M. v. Margaret M.*, 182 W. Va. 57, 385 S.E.2d 912 (1989).' Syl. Pt. 1, *In re Abbigail Faye B.*, 222 W. Va. 466, 665 S.E.2d 300 (2008)." Syl. Pt. 2, *In re Antonia R.A.*, 228 W. Va. 380, 719 S.E.2d 850 (2011).

2.      "'Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review.' Syllabus point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995)." Syl. Pt. 2, *In re Abbigail Faye B.*, 222 W. Va. 466, 665 S.E.2d 300 (2008).

2.      "A parent has the natural right to the custody of his or her infant child and, unless the parent is an unfit person because of misconduct, neglect, immorality, abandonment or other dereliction of duty, or has waived such right, or by agreement or otherwise has transferred, relinquished or surrendered such custody, the right of the parent

i

to the custody of his or her infant child will be recognized and enforced by the courts." Syllabus, *Whiteman v. Robinson*, 145 W. Va. 685, 116 S.E.2d 691 (1960).

3.      "When a natural parent transfers temporary custody of . . . [his or her] child to a third person and thereafter seeks to regain custody of that child, the burden of proof shall be upon that parent to prove by clear and convincing evidence that he or she is fit; thereafter the burden of proof shall shift to the third party to prove by clear and convincing evidence that the child's environment should not be disturbed because to do so would constitute a significant detriment to the child notwithstanding the natural parent's assertion of a legal right to the child." Syl. Pt. 2, in part, *Overfield v. Collins*, 199 W. Va. 27, 483 S.E.2d 27 (1996).

Workman, Chief Justice:

This case is before the Court upon the appeal of the Petitioners D.B.[1] (hereinafter "the Petitioner grandfather") and D.B.[2] (hereinafter "the Petitioner grandmother") from the February 27, 2014, final order of the Circuit Court of Mingo County, West Virginia, denying their[3] petition for guardianship of their granddaughter, F.R.[4] The Petitioners contend that the circuit court erred: 1) in finding that the Temporary Agreed Order granting the Petitioners temporary custody of the child terminated at the commencement of the guardianship hearing; 2) in ordering transfer of the custody of the child to the Respondent

---

[1] Because this case involves a child and sensitive matters, we follow our practice of using initials to refer to the parties. *See* W. Va. R. App. P. 40(e); *State v. Edward Charles L.*, 183 W. Va. 641, 645 n.1, 398 S.E.2d 123, 127 n.1 (1990).

[2] The Petitioner grandmother is not the child's biological maternal grandmother. She had been in a long-term relationship with the Petitioner grandfather and married him after he filed a petition for guardianship. While the initial petition was filed by the Petitioner grandfather, it was later amended to also include the Petitioner grandmother. Consequently, we refer to the grandparents collectively as the Petitioners throughout the opinion.

[3] The petition for guardianship did not expressly indicate whether temporary or permanent guardianship was being sought. The initial petition, prior to adding the Petitioner grandmother, simply sought to have the Petitioner grandfather be granted legal guardianship of the infant child.

[4] The child remains in the legal and physical custody of the Petitioners. By order entered March 12, 2014, the final ordered entered February 27, 2014, was stayed pending appeal, and the parties were instructed to follow the Agreed Temporary Order regarding custody and visitation.

1

father, J.R. (hereinafter also referred to as "the Respondent father"), the child's biological father, without requiring clear and convincing evidence of the Respondent father's fitness as a parent; 3) by ignoring the opinions of the Petitioners' expert witness, Dr. Amelia Santiago, the child's treating physician; and 4) by ignoring the Petitioners' clear and convincing evidence that a change of custody of the child would constitute a significant detriment to the child.[5] Upon review of the parties' briefs[6] and oral arguments, the appendix record and all other matters submitted before this Court, we find that the circuit court erred in failing to apply the standard enunciated by this Court in *Overfield v. Collins*, 199 W. Va. 27, 483 S.E.2d 27 (1996). We therefore reverse the circuit court's decision and remand the case for further proceedings consistent with this opinion.

## I. FACTS

B.B. and the Respondent father were in a relationship. They had a child, F.R.,

---

[5]Despite the assigned errors, the Petitioners' main argument centers upon the circuit court returning the child to the Respondent father's custody without requiring the Respondent father to prove that he was a fit parent. It is this error that we find warrants reversal and remand by this Court.

[6]The summary response filed by the guardian ad litem indicates that "upon information and belief, the [Respondent] father . . . has obtained employment in the northern part of the state and only comes home on the weekends." There were also concerns about the lack of child-proofing in the home, the instability of people living in the home, the number of animals the father has and the fact that the father only has a motorcycle for transportation. He also has made no concrete arrangements for child care and, according to status updates, there is a continued concern about his smoking around his daughter because of her asthma.

who is now three years old.  B.B. died in a single vehicle accident on July 12, 2012.

According to the undisputed testimony of the Petitioner grandfather at the guardianship hearing, B.B. and F.R. resided with the Petitioners from the time F.R. was three months old until about a month before B.B.'s death,[7] when she and F.R. moved in with B.B.'s mother.[8]

Following B.B.'s death, the Petitioner grandfather filed a petition for guardianship on July 24, 2012, which the Respondent father answered.[9]   On October 1, 2012, the parties entered into an Agreed Temporary Order, wherein they agreed that the Petitioner grandfather was the "Temporary Guardian of the infant," F.R.  The Respondent father also agreed to temporary weekend visitation and a guardian ad litem was appointed for the child.  The language of the order provides that "the parties had reached a temporary parenting agreement until a Final Evidentiary Hearing could be held by the Court."

---

[7]The circuit court found in its February 27, 2014, order that B.B. and the Respondent father shared custodial responsibility over F.R. until B.B. died; however, the evidence in the appendix record fails to support this finding.

[8]B.B. lived with her mother while she was looking for employment and the Petitioner grandfather stated that during the month, she and F.R. went back and forth between B.B.'s mother's home and his home.

[9]*See supra* note two.

The evidentiary hearing[10] referred to in the Agreed Temporary Order did not occur until over a year later on December 18, 2013.[11] According to Rebecca Marcum with Child Protective Services ("CPS"), who testified at the hearing, as a result of the guardianship petition being filed, CPS received an order from the court[12] "to open up a case and do a family function assessment" on the Respondent father. Ms. Marcum testified that they were able to substantiate domestic violence between the Respondent father and B.B.

The first instance of domestic violence occurred on February 24, 2011, five months before F.R.'s birth. Ms. Marcum testified that the Respondent father admitted that he stopped B.B.'s car and "took her keys and her cell phone and was hitting her and she filed an EPO [or Emergency Protective Order] and stated that she feared for her life and F[.R.]'s life."

About a month later, in March of 2011, there was another domestic violence incident. Ms. Marcum testified that the Respondent father admitted to hitting B.B. after the

---

[10]The Honorable John L. Cummings, a senior status judge, was appointed by the West Virginia Supreme Court to hear cases in Mingo County at the time of the evidentiary hearing.

[11]There is no explanation in the record for why the evidentiary hearing referenced in the Agreed Temporary Order did not occur until over a year after the order was entered.

[12]It is unclear from the appendix record why then-Judge Michael Thornsbury ordered CPS to open a case in this matter. It may have been due to the allegation in the petition for guardianship that the Respondent "was arrested for Domestic Battery and Child Neglect creating risk of injury . . . ."

4

Respondent father became mad when B.B. laughed at him after he accused her of stealing items from him. The Respondent father told Ms. Marcum that he did not know that B.B. was pregnant at the time he hit her.

Ms. Marcum was also prepared to testify regarding an August 31, 2011, incident of domestic violence between the Respondent father and B.B. It was during Ms. Marcum's testimony, however, that the circuit court, sua sponte, questioned the relevancy of the testimony, stating that the court didn't "think it [wa]s relevant to the issue . . . [of] the guardianship between" the Respondent father and the Petitioners. The circuit court questioned "the relevance of what occurred in regard to any form of domestic violence after the death of B[.B.] on . . . July 12, 2012." The circuit court again stated: "If B[.B.] was still alive and if this were a domestic case, this would be very relevant; however, after her death that cause, in effect, ceases with her death. I'm going to sustain the objection as to relevance."

Despite the circuit court instructing the Petitioners' counsel not to go any further into the domestic violence incidents because "they do not count as far as the relevance," the circuit court did allow a proffer of what the testimony would be concerning the August 31, 2011, incident. The Petitioners' counsel then proffered that the evidence would establish that the Respondent father admitted to shooting a BB into a car when B.B.

and the child were inside the car. The circuit court also allowed the Petitioner grandfather to testify about the incident involving the BB gun. The Petitioner grandfather testified that he observed his daughter's car after the incident and took photographs of the car. The Petitioner grandfather also testified that his grandchild was inside the vehicle at the time of the incident. The Respondent father testified and admitted that he told Ms. Marcum that he shot at B.B.'s car. He, however, denied knowing that the child was in car. The Respondent father testified that the child was not in the car at the time he shot the BB gun at the vehicle.

There was also evidence of an incident involving domestic violence that occurred on April 5, 2012.[13] Deputy Barry Moore with the Mingo County Sheriff's Department testified that he investigated an incident in which the Respondent father struck B.B. with a flashlight and then followed her car in a threatening and erratic fashion while F.R., who was then nine months old, was in the car. The Respondent father was charged with domestic battery and child neglect creating a risk of injury. The Respondent father served time for domestic battery, but the child neglect charge was dismissed as part of a plea deal.

In addition to the domestic violence incidents, Ms. Marcum also testified regarding a home visit to the Respondent father's house in which she found the Respondent

---

[13]There was no objection raised regarding relevancy concerning this event.

6

father's mother, a caregiver of the child on occasion,[14] under the influence of oxycodone. Ms. Marcum testified that when she went to the Respondent father's mother's job to interview her, his mother also appeared to be under the influence while at work. Drug testing was conducted on the Respondent father's mother and she tested positive for oxycodone. She subsequently quit participating in random drug testing. Additionally, Ms. Marcum testified that the Respondent father's mother's husband was uncooperative and was aggressive at times. He refused to undergo any random drug testing. The Respondent father agreed that neither of these individuals would be appropriate care givers for the child.[15]

Ms. Marcum testified to the following report made as a result of her investigation:

> "There is history of severe domestic violence between J[.R.] and B[.B.] However, B[.B.] is now deceased and J[.R.] is not in another relationship for worker to be able to evaluate him presently. J[.R.] was exposed to domestic violence from an early age. Worker substantiated emotional abuse due to domestic violence in the presence of the child. Worker feels that J[.R.] lacks impulse control and does not think before he acts. J[.R.] has a history of not protecting his child and placing

---

[14] The Respondent father's mother did not live in the same home with the Respondent father.

[15] There was also testimony that the Respondent father shared his home with an ailing grandmother and a brother, who was affected by a severe traumatic brain injury. During oral argument it was disclosed that the Respondent father's grandmother had passed away. Moreover, Ms. Marcum testified that the ailing brother would not be an appropriate caregiver for the child.

her in dangerous situations by exposing her to domestic violence when his anger becomes out of control."

Despite this report, Ms. Marcum also testified on cross-examination when asked if the Respondent father was an appropriate caregiver: "He was very compliant. He cooperated, he completed parenting, he completed adult life skills, he completed anger management. We can't say that he's not an appropriate care giver." She further testified that "[h]ypothetically, if a parent cooperates and they complete their services and they show a change, then, yes, we recommend reunification."[16]

Finally, Ms. Marcum testified that she found that the Petitioners were appropriate guardians for F.R. She further testified that the child had bonded with the Petitioner grandmother and calls her "mommy."

The Respondent father testified and admitted to engaging in domestic violence with B.B. and that it continued after F.R.'s birth. The Respondent father also testified that on August 9, 2013, during a scheduled visitation, he was arrested for driving a motorcycle sixty miles an hour in a forty-five mile an hour zone. During this episode, his daughter was in the care and custody of his mother. He testified that he did not know that his mother was taking oxycodone, but also acknowledged that his mother was not a "primary caregiver for

---

[16]Ms. Marcum testified that she had become Facebook friends with the Respondent father.

8

my daughter." Further, the Respondent father agreed that his stepfather, grandmother and brother were not appropriate caregivers for the child. The Respondent father acknowledged that F.R. was very close to the Petitioners. He also testified that if he had custody of his daughter he would not eliminate the relationship F.R. had with the Petitioners.

Lastly, there was significant testimony from F.R.'s board certified pediatrician, Amelia J. Santiago, concerning the child's asthma. Dr. Santiago testified that F.R. was diagnosed with asthma on December 19, 2012. The doctor stated that she had seen the child several times before and after the diagnosis. Dr. Santiago stated that the child's asthma could be exacerbated by secondhand smoke from cigarettes. This testimony was relevant because both the Respondent father and his grandmother were cigarette smokers. Dr. Santiago testified that she believed that the child had reoccurring exacerbation of asthma due to exposure to smoke. Specifically, Dr. Santiago testified:

> It has been accepted for quite awhile now that second hand smoke or passive smoking is bad for children because it impairs their ability to fight and move the mucous in their lungs, so we have always for more than twenty years we have recommended that children with their small lung capacity not be exposed to any cigarette smoke . . . . This has been accepted in the medical community . . . .

Dr. Santiago was challenged on cross-examination concerning her lack of "any actual physical, scientific or first hand knowledge that th[e] child was ever exposed to second hand smoke[.]" The doctor acknowledged that she had not witnessed the child being exposed to

9

secondhand smoke; however, the Petitioners had informed her that the child was being exposed to cigarette smoke during the child's visits with the Respondent father.

Regarding F.R.'s asthma and her doctor's testimony that she should not be around secondhand smoke, the Respondent father admitted to smoking, but said he did so only on the front porch. He said he typically smokes about a half-pack of cigarettes when his daughter is with him. He also testified that on at least one occasion he took the child outside with him when he smoked, stating "[i]t's an open porch. The wind blows thr[ough]."

On February 27, 2014, almost three months after the evidentiary hearing concluded, the circuit court entered its final order denying the petition for guardianship. Specifically, the circuit court, in reaching its decision, found the following standard enunciated in the syllabus of *Whiteman v. Robinson*, 145 W. Va. 685, 116 S.E.2d 691 (1960), to be applicable and controlling:

> A parent has the natural right to the custody of his or her infant child and, unless the parent is an unfit person because of misconduct, neglect, immorality, abandonment, or other dereliction of duty, or has waived such right, or by agreement or otherwise has transferred, relinquished or surrendered such custody, the right of the parent to the custody of his or her infant child will be recognized and enforced by the courts.

The circuit court then found that the Agreed Temporary Order, which named the Petitioner grandfather as F.R.'s guardian "dissolved by its own language on December 18, 2013, at the commencement of the First Evidentiary Hearing[]" and that there was "no grant of temporary

10

custody . . . in place at the time of the Final Evidentiary Hearing." The circuit court again, "[a]pplying *Whiteman*" found that "the [R]espondent [father] has not 'waived such right [to custody of his child], or by agreement or otherwise has transferred, relinquished or surrendered such custody . . . ,' of his child to anyone."

The circuit court further found, regarding the child's asthma, that "Dr. Santiago opined that the asthma was caused and exacerbated by the inhalation of second-hand smoke." The circuit court, however, also found that because the doctor "did not have the foundational knowledge to know what either caused the asthma or exacerbated it[,]"and that because the child also suffered "asthma exacerbation" when in the care of the Petitioners, who did not smoke, these facts "tended to show how attenuated the connection between the second-hand smoke and the asthma exacerbation is."[17] The circuit court also made a specific finding that "the Respondent father, when smoking, does so in an open area where the child could only have minimal exposure."

The circuit court additionally found it had heard testimony from three witnesses

---

[17]According to the appendix record, Dr. Santiago is a licensed, board certified pediatrician, who practiced in the Mingo County area for more than thirty years. She was certainly qualified to give her medical opinion concerning the child's asthma being aggravated by secondhand smoke. Moreover, contrary to the circuit court's finding that the doctor testified that the child's asthma was caused by secondhand smoking, the record shows that Dr. Santiago never testified to that and, accordingly, this factual finding by the circuit court is erroneous.

about

> three[18] instances of domestic violence between the Respondent father and his former wife.[19] The first incident resulted in an Emergency Protective Order being entered against the Respondent [father] in Wyoming County, West Virginia[,] on February 24, 2011 (Case Number 11-D-49). The next incident resulted in an Emergency Protective Order being entered against the Respondent [father] in Wyoming County, West Virginia[,] on September 3, 2011 (Case Number 11-D-263). The last incident resulted in the Respondent [father] pleading guilty to a Domestic Battery charge in Mingo County, West Virginia[,] with dismissal of the felony child neglect creating a risk of injury (Case Number 12-M-484 and 12-F-151).

(Footnote added). Regarding the foregoing finding, the circuit court, however, failed to include its determination during the evidentiary hearing that it found the evidence irrelevant. As the circuit court ruled during the hearing, "if B[.B.]was still alive and if this were a domestic case, this would be very relevant; however, after her death that cause, in effect, ceases with her death." Notwithstanding its determination that the evidence of domestic violence was irrelevant, the circuit court found that "[h]owever applying the *Whiteman* standard," that "the Respondent [father] is not 'an unfit person because of misconduct, neglect, immorality, abandonment, or other dereliction of duty,' despite the three incidents [of domestic violence]."

---

[18]Notwithstanding evidence of four instances of domestic violence, the circuit court only referenced and discussed three having determined that the incident involving a BB gun was not relevant.

[19]The circuit court erroneously found that the Respondent father and B.B. had been married. There was no evidence to support this finding.

The circuit court then found that the Petitioners had "failed to prove by clear and convincing evidence" that their appointment as guardians was in the child's best interest. The court also based its decision on its determination that none of the five circumstances listed in West Virginia Code § 44-10-3(f)(1-5) (2014) (providing for appointment and termination of guardian for minor) to establish guardianship had been met and, therefore, the Petitioners failed to meet their burden under the statute and case law.

## II. Standard of Review

In syllabus point two of *In re Antonia R.A.*, 228 W. Va. 380, 719 S.E.2d 850 (2011), this Court applied the following standard of review to a case involving a petition for guardianship:

> "'The exercise of discretion by a trial court in awarding custody of a minor child will not be disturbed on appeal unless that discretion has been abused; however, where the trial court's ruling does not reflect a discretionary decision but is based upon an erroneous application of the law and is clearly wrong, the ruling will be reversed on appeal.' Syllabus point 2, *Funkhouser v. Funkhouser*, 158 W. Va. 964, 216 S.E.2d 570 (1975), *superseded by statute on other grounds as stated in David M. v. Margaret M.*, 182 W. Va. 57, 385 S.E.2d 912 (1989)." Syl. Pt. 1, *In re Abbigail Faye B.*, 222 W. Va. 466, 665 S.E.2d 300 (2008).

Further, "'[w]here the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review.' Syllabus

13

point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995)." *In re Abbigail Faye B.*, 222 W. Va. at 469, 665 S.E.2d at 303, Syl. Pt. 2.

Applying the above-mentioned standards, we examine the issues before us.

## III.  Discussion of Law

The issue upon which this case turns is whether the circuit court erred in ordering transfer of the custody of the child to the Respondent father, the child's biological father, without requiring clear and convincing evidence of his fitness as a parent.  The Petitioners argue that the circuit court incorrectly placed the burden of proof upon the Petitioners to prove that the Respondent father was unfit to parent the child.  Instead, the Petitioners assert that because the Respondent father had transferred custody of the child to the Petitioners, the law requires him to prove by clear and convincing evidence that he is a fit parent. *See Overfield*,  199 W. Va. at 29, 483 S.E.2d at 29, Syl. Pt. 2.  Further, the Petitioners contend that due to the instances of domestic violence, as well as other evidence introduced during the evidentiary hearing, the Respondent father failed to establish his fitness as a parent by clear and convincing evidence.  In contrast, the Respondent father asserts that the circuit court correctly determined that he was a fit parent.

Generally, one seeking the appointment as a guardian for a minor child carries

the burden of proof as set forth in West Virginia Code § 44-10-3:

> (f) The court may appoint a guardian for a minor *if the court finds by clear and convincing evidence that the appointment is in the minor's best interest* and:
> (1) The parents consent;
> (2) The parents' rights have been previously terminated;
> (3) The parents are unwilling or unable to exercise their parental rights;
> (4) The parents have abandoned their rights by a material failure to exercise them for a period of more than six months; or
> (5) There are extraordinary circumstances that would, in all reasonable likelihood, result in serious detriment to the child if the petition is denied.
> (g) Whether or not one or more of the conditions of subsection (f) have been established, the court may appoint a temporary guardian for a minor upon a showing that an immediate need exists or that a period of transition into the custody of a parent is needed so long as the appointment is in the best interest of the minor. . . .
>
> . . . .
>
> (j) For a petition to revoke or terminate a guardianship filed by a parent, the burden of proof is on the moving party to show by a preponderance of the evidence that there has been a material change of circumstances and that a revocation or termination is in the child's best interest.

*Id*. (emphasis added).

In *Whiteman*, a biological father filed a petition for habeas corpus in the circuit court to regain custody of his three-and-one-half year old daughter from the child's maternal

uncle and his wife.[20] 145 W. Va. at 686, 116 S.E.2d at 692. The child's mother, who was married to the father, suffered from a mental disability. The mother and father were from West Virginia, but were residing in Seattle, Washington. The child's mother disappeared and was subsequently found dead. During the interval between the mother's disappearance and the discovery of her body some twenty days later, the father communicated with members of their family in West Virginia concerning his wife's absence and his situation of caring for four young children. His wife's brother, the children's uncle, went to Seattle to assist the father with bringing the children to West Virginia. Each child was placed with members of the father's family on a temporary basis. The youngest was placed with the maternal uncle. *Id.* at 687, 116 S.E.2d at 692. There was no written agreement between the parties transferring custody of the child from the father to the uncle. Instead, it was understood by both the father and the uncle that the placement of the youngest child with the uncle was of a temporary nature, not to exceed six months after the father's remarriage,[21] but could end sooner if the father wanted custody back. *Id.* at 687-88, 116 S.E.2d at 693. When the father sought to regain custody of his child, the uncle refused. The uncle believed that it was in the child's best interest to remain with him and his wife permanently. *Id.* at 689-90, 116 S.E.2d at 694.

---

[20]The couple had four children, but only the youngest was the subject of the habeas petition.

[21]The father did remarry within a short period of time after the mother's death. 145 W. Va. at 688, 116 S.E.2d at 693.

Despite finding that both the father and the uncle were suitable persons to have care and custody of the child, the circuit court refused to award custody of the child to the child's father, because the father had failed to prove that "a change of custody from the defendants [the uncle and his wife] to the petitioner [the father] would promote the welfare of the child." *Id*. at 686, 112 S.E.2d at 692.

On appeal, this Court reversed the circuit court's decision and ordered that the custody of the child be returned to the father. *Id*. at 696, 116 S.E.2d at 697. The Court found that the father

> has never, by agreement or otherwise, transferred, relinquished or surrendered the custody of his child to the defendants but instead has in effect merely permitted them to have the temporary possession of the child subject to the right of the petitioner [the father] to terminate such possession at any time or, in any event, at the expiration of six months after the petitioner should remarry.

*Id*. at 695, 116 S.E.2d at 697. Thus, the father had "the natural right to the custody" of his child as there were no allegations that he was an unfit person and he had not transferred custody of the child to the uncle. 145 W. Va. at 685, 116 S.E.2d at 691-92, Syllabus.

Years later in *Overfield*, this Court was presented with a biological mother suing her parents to regain custody of her two children. 199 W. Va. at 31, 483 S.E.2d at 31. The mother, by affidavit, granted custody of the children to their maternal grandparents, after

17

the mother had suffered a traumatic injury. The mother maintained that she had only given her parents temporary custody of the children, while the grandparents argued that the intention was to permanently transfer custody of the two children to them. *Id.*

Seven days after the affidavit was executed by the parties, the grandparents filed an action seeking an order granting them permanent custody of the children. The circuit court entered the requested order granting the grandparents permanent custody. *Id.* at 32, 483 S.E.2d at 32.

Over a year later, when the mother's health had improved, she filed a petition to regain custody of her children. The circuit court denied the petition, finding that because the mother had transferred permanent custody of the children to the grandparents it was incumbent upon her to show that a return of custody would be in the children's best interests. The circuit court found that the mother failed to meet her burden. *Id.*

On appeal, this Court reversed the lower court's decision and remanded the case for further proceedings. Relevant to the instant matter, the Court held in syllabus point two of *Overfield* that when either temporary or permanent custody is transferred by a parent to a third party, the burden of proof to regain custody of the child is on the parent as follows:

> When a natural parent transfers temporary custody of their child to a third person and thereafter seeks to regain

18

custody of that child, the burden of proof shall be upon that parent to prove by clear and convincing evidence that he or she is fit; thereafter the burden of proof shall shift to the third party to prove by clear and convincing evidence that the child's environment should not be disturbed because to do so would constitute a significant detriment to the child notwithstanding the natural parent's assertion of a legal right to the child.

*Id.* at 30, 483 S.E.2d at 30, Syl. Pt. 2, in part.

In the instant case, the Agreed Temporary Order named the Petitioner grandfather "Temporary Guardian" of F.R. and allowed the Respondent father to have "temporary weekend visitation" with the child "until a Final Evidentiary Hearing could be held by the Court." The circuit court found that the temporary order "dissolved by its own language on December 18, 2013, at the commencement of the Final Evidentiary Hearing." The circuit court then found that the standard set forth in *Whitefield* was the applicable standard to be used in the case and "the *Overfield v. Collins* standard . . . [was] inapplicable in the case at bar because no grant of temporary custody was in place at the time of the Final Evidentiary Hearing." Consequently, the circuit court placed the burden of proof upon the Petitioners to establish by clear and convincing evidence that the Respondent father was an unfit parent. The court, based upon its assessment of the evidence, found that the Petitioners failed to satisfy their burden.

In examining the instant matter, we find that the circuit court erred in its

19

application of *Whiteman*, rather than *Overfield,* to reach its decision. Essentially, the circuit court ignored the transfer of custody of the minor child from the Respondent father to the Petitioners, which is unequivocally evinced in the Agreed Temporary Order entered into between the parties. Consequently, the facts do not support the circuit court's finding that no temporary transfer of custody was in place at the time of the final evidentiary hearing. Moreover, it is simply illogical and ill-advised for the circuit court to have found that the temporary order "dissolved by its own language on December 18, 2013, at the commencement of the Final Evidentiary Hearing." To make such a determination effectively meant that the child went without any guardian in place from December 18, 2013, until the final order was entered on February 27, 2014. Moreover, the purpose of having a final evidentiary hearing was to determine whether the Petitioners should be made the permanent guardians of the child or whether the temporary guardianship should be terminated. That determination could not be made until the hearing was complete and the circuit court entered an order. "A court of record speaks only through its orders. . . ." *State ex rel. Erlewine v. Thompson*, 156 W. Va. 714, 718, 207 S.E.2d 105, 107 (1973). Thus, the circuit court's imposition of the wrong burden of proof necessarily was predicated upon an erroneous ruling that no temporary transfer of custody had occurred.

Consequently, pursuant to the law enunciated by the Court in *Overfield*, because there was a temporary transfer of custody, the Respondent father carried the burden

20

of proving by clear and convincing evidence that he was a fit parent. 199 W. Va. at 30, 483 S.E.2d at 30, Syl. Pt. 2. After that burden was met, then the burden of proof would shift to the Petitioners "to prove by clear and convincing evidence that the child's environment should not be disturbed because to do so would constitute a significant detriment to the child notwithstanding the natural parent's assertion of a legal right to the child." *Id*. Because the circuit court's decision in this case was based upon a misapplication of the burden of proof, which stemmed from the court's incorrect finding that a temporary transfer of custody did not occur in this case, we must reverse the decision in this case and remand for further proceedings.

We also find that the circuit court erred in determining that incidents of domestic violence between the Respondent father and the child's deceased mother were not relevant to its determination of the Respondent father's parental fitness. We have consistently found that evidence of domestic violence is relevant to the determination of whether a parent is fit. *See* Syl. Pt. 1*, Henry v. Johnson*, 192 W. Va. 82, 86, 450 S.E.2d 779, 783 (1994) (holding that "[c]hildren are often physically assaulted or witness violence against one of their parents and may suffer deep and lasting emotional harm from victimization and from exposure to family violence; consequently, a family law [judge] should take domestic violence into account when making an award of temporary custody[,]" based upon a recognition that "[i]t is clear that where domestic violence is present it should be considered

21

when determining parental fitness."); *Nancy Viola R. v. Randolph W.*, 177 W. Va. 710, 714, 356 S.E.2d 464, 468 (1987) ("We have recognized that spousal abuse is a factor to be considered in determining parental fitness for child custody."); *Collins v. Collins*, 171 W. Va. 126, 127, 297 S.E.2d 901, 902 (1982) (upholding trial court's decision to grant permanent custody of child to paternal grandparents based, in part, on the trial court's finding that the child's mother had "demonstrated [a] tendency to be violent as evidenced by her willingness to threaten with and to actually shoot a deadly weapon at human beings when she was upset, but not in any way threatened.").

In *Nancy Viola R.*, a maternal aunt sought custody of her nephew after her nephew's father was indicted for first degree murder of the child's mother. Throughout the marriage of the child's parents, the mother had been a victim of repeated acts of violence and abuse by her husband. Prior to the mother's death, she and the child had been separated from the father for four months. 177 W. Va. at 712, 356 S.E.2d at 466. After the mother's death, the child resided with his maternal aunt. During the custody proceeding, the trial court found the father of the child to be fit and that the father, as a fit parent, could designate the child's guardian. The father designated the child's paternal uncle. *Id.* at 711-12, 356 S.E.2d at 465-66. The father thereafter plead guilty to first degree murder of his wife. The maternal aunt sought reconsideration of the order granting guardianship to the child's paternal uncle. *Id.* at 712, 356 S.E.2d at 466. When the trial court denied the maternal aunt's motion, she

22

appealed.

The issue before the Court on appeal in *Nancy Viola R.* was whether the father was a fit parent. *Id.* In resolving that issue, we noted that the father's abuse of his wife was "an important consideration" in the case and similarly "[o]ther courts also regard spousal abuse as an important consideration in child custody cases." *Id.* at 714, 356 S.E.2d at 468 (citing *In re Marriage of Cline*, 433 N.E.2d 51, 54 (Ind.Ct.App.1982); *In re Marriage of Ballinger*, 222 N.W.2d 738, 739 (Iowa 1974); *Hosey v. Myers*, 240 So.2d 252, 253 (Miss.1970); *Schiele v. Sager*, 571 P.2d 1142, 1146 (Mont. 1977)). We followed the reasoning of the Supreme Court of Iowa in *In re Marriage of Snyder*, 241 N.W.2d 733 (Iowa 1976), that "assaults of a spouse reveal violent tendencies which may render a parent unfit for custody of his or her child." 177 W. Va. at 714, 356 S.E.2d at 468. We further noted from the *Snyder* case that even though there was no evidence that the father had ever abused his child, "the father's 'meanness, aggressiveness, and tendency to[ward] violence expose[d] [the child] to more danger'" than any of the mother's transgressions. *Id.* at 714, 356 S.E.2d at 468 (quoting, in part, *Snyder*, 241 N.W.2d at 474). We then found, in *Nancy Viola R.*, that the circuit court erred in finding that the father was a fit parent based not only on the father's first degree murder conviction of the child's mother, but also on "other acts of violence toward . . . [the mother] and threats of violence to the child . . . ."[22] *Id.* at 716, 356 S.E.2d

---

[22]The child was committed to the "permanent guardianship of the West Virginia
(continued...)

23

at 470; *see generally Guardianship of Simpson*, 79 Cal.Rptr.2d 389, 404 (Cal. Ct. App. 1998) ("Domestic violence is always a serious concern, and any propensity to it is highly relevant as regards children's welfare.").

In the instant case, the burden was on the father to show by clear and convincing evidence that he was a fit parent. *Overfield*, 199 W. Va. at 30, 483 S.E.2d at 30, Syl. Pt. 2, in part. As previously stated, we have been unwavering in emphasizing the importance that evidence of domestic violence plays in determinations of whether a parent is fit. *See Nancy Viola R*, 177 W. Va. at 714, 356 S.E.2d at 468. Whether the individual who was the victim of domestic violence is deceased is not the focus of the inquiry, rather the focus is on the individual who demonstrated the violent tendencies in the first instance.

Because the circuit court applied the holding in *Whiteman,* rather than *Overfield*, and because the circuit court found the evidence of domestic violence not relevant at the evidentiary hearing that was conducted, we find it is necessary to remand this case. Upon remand, the trial court should consider the petition for guardianship under the applicable law set forth in *Overfield*. Further, the evidence of domestic violence is relevant to the determination of whether the Respondent father is a fit parent.

---

[22](...continued)
Department of Human Services" with temporary custody given to Nancy R. 177 W. Va. at 716, 356 S.E.2d at 470.

## IV.  Conclusion

Based upon the foregoing, the decision of the circuit court is reversed and this case is remanded for further consideration consistent with this opinion.

Reversed and remanded.