**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**


In Re: L.H.
No. 17-0102 (Raleigh County No. 14-JA-275K)

AND

In Re: L.H. and I.H.
No. 17-0103 (Raleigh County No. 14-JA-276K)

**FILED**

**November 7, 2017**

**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA


**MEMORANDUM DECISION**


This case arises out of child abuse and neglect proceedings. The Mother of two infant children, M.H.[1] ("Mother"),[2] appeals from an order entered on December 29, 2016, wherein the Circuit Court of Raleigh County awarded permanent subsidized guardianship of the children to others with reasonable visitation for Mother. Infant I.H. was placed in the custody of her paternal grandmother, P.H. ("Grandmother").[3] E.H., the Father of I.H. ("Father 2"), did not appeal the award of permanent guardianship with visitation. Infant L.H. was placed in the custody of non-related intervenors, C.F. and H.F. ("Standing Grandparents"),[4] who had cared for the child rather than in the custody of his biological

---

[1] "We follow our past practice in juvenile . . . cases which involve sensitive facts and do not utilize the . . . names of the parties." *State ex rel. W. Va. Dep't of Human Servs. v. Cheryl M.*, 177 W. Va. 688, 689 n.1, 356 S.E.2d 181, 182 n.1 (1987) (citations omitted).

[2] Mother is represented by Gerald Hayden.

[3] Robert P. Dunlap and Sarah F. Smith represents Grandmother.

[4] The non-related intervenors, wife C.F. and husband H.F., are denominated "Standing Grandparents" based upon the appellation ascribed to them by an emergency care document executed by Father 1 and discussed more fully *infra*. Moreover, it should be noted that H.F. passed away during the pendency of the instant proceedings. Thus, where the context so requires, C.F. will be referred to individually as "Standing Grandmother." They are represented by Winifred L. Bucy.

1

father, R.E. ("Father 1"),[5] against whom no allegations of abuse and neglect were made. Father 1 appeals the order insofar as it divested him of custody of L.H. and granted him only undefined reasonable and seasonable visitation rights. The Guardian *ad litem* ("Guardian")[6] and the Department of Health and Human Resources ("DHHR")[7] submit that the order of subsidized guardianship as to both children was in error and further support placement of L.H. with his fit biological father, Father 1. Standing Grandparents, joined by Grandmother, argue that the findings and conclusions of the circuit court should be affirmed.

Upon our review of the parties' arguments, the appendix record, and the pertinent authorities, we find that the circuit court erred by ordering that infant L.H. be placed in the home of a non-relative third party rather than in the custody of his non-offending biological father, Father 1, against whom no allegations of abuse and neglect were made. We also find that it is in the best interest of L.H. to have a change of placement managed in accordance with a properly developed transitional plan, and, once transition is accomplished, to continue to maintain his relationship with Standing Grandmother such that reasonable visitation must be afforded. Accordingly, we reverse and remand this case for further hearings consistent with the findings and directions announced herein. Furthermore, in consideration of the Rule 11(j) update material submitted to this Court, we find that the parental rights of Mother to L.H. and I.H. must be, and they hereby are, terminated inasmuch as there is no reasonable likelihood that the conditions of abuse and neglect can be substantially corrected in the near future. Additionally, in consideration of the Rule 11(j) update material, this Court directs the circuit court to immediately convene a hearing to determine whether the parental rights of the biological father of I.H., Father 2, should be terminated. Because this case does not present a new or significant issue of law, and for the reasons set forth herein, we find this case satisfies the "limited circumstances" requirements of Rule 21(d) of the West Virginia Rules of Appellate Procedure and is proper for disposition as a memorandum decision.

On December 8, 2014, a Petition to Institute Child Abuse and Neglect Proceedings was filed by DHHR seeking, among other things, custody of two infant children: L.H., born in 2010, and I.H., born in 2014. According to the Petition, DHHR received a referral on December 1, 2014, that the Mother of both children was a hospital patient who had given birth to baby girl I.H. while testing positive for THC, cocaine, and opiates. It also was reported that Mother may be homeless and that her other child, L.H., was "bounced" from family member to family member. It further was asserted that Mother admitted to drug

---

[5]Mary Beth Chapman represents Father 1.

[6]The Guardian *ad litem* for the infant children herein is Matthew Victor.

[7]Assistant Attorney General S.L. Evans represents DHHR.

addiction, using illegal drugs during the course of her pregnancy with I.H., and taking the narcotic "roxy 30" the day she went into labor. Subsequently, it was learned that baby I.H. was suffering from withdrawal. The DHHR worker also interviewed Father 2, who admitted knowing that Mother abused drugs during the pregnancy and that she had made an unsuccessful attempt at detox. DHHR further asserted that Standing Grandmother reported that she had provided care for L.H. since birth, less approximately an eight-month period when Mother cared for L.H. Standing Grandmother indicated that Mother provided no financial support for L.H. and went long periods of time without contact. No allegations were made against L.H.'s father, Father 1, who lived in Arizona.

Thereafter, the circuit court entered an order finding the children to be in imminent danger and transferring their custody to DHHR. The Court further directed that a multidisciplinary team meeting ("MDT") be convened. Finally, a Guardian *ad litem* was appointed for the children, and counsel was appointed for Mother, Father 2, and Father 1.

On December 22, 2014, at the preliminary hearing, Standing Grandparents filed a Petition to Intervene as to L.H. together with a Motion to Dismiss the Abuse and Neglect Petition as to L.H. Standing Grandparents also filed a motion seeking custody of L.H., which included a draft petition for adoption and name change with exhibits consisting of a prepared typed and notarized document styled "Unconditional Relinquishment and Consent for Adoption" supporting their adoption of L.H., which had been executed by Mother on December 5, 2014. An additional exhibit consisted of a copy of a handwritten, notarized document regarding L.H. dated February 11, 2013, signed by Father 1 and representing that Father 1 "grant[s] guardianship to [Standing Grandparents] [unreadable] them to undertake full financial and medical responsibilities in the absence of my presence." The note further stated that Standing Grandparents "have been [L.H.'s] standing grandparents since his birth. Again, I grant [them] guardianship in the absence of my presence." Counsel for Standing Grandparents was permitted to appear at the preliminary hearing.[8]

Among other things, at the preliminary hearing, the circuit court was informed that DHHR had placed I.H. with Grandmother and had placed L.H. with Standing Grandparents because "the child was there," and no allegations had been made against them. In regard to Standing Grandparents, the court remarked that it "sensed" that "perhaps" they were psychological grandparents to L.H. As to Father 1, the circuit court commented: "I know this

---

[8]Standing Grandparents submitted an additional exhibit, which was a December 15, 2014, letter from their attorney to Father 1 asking him to sign an Unconditional Relinquishment and Consent for Adoption. Father 1 refused to sign this document or otherwise grant his consent to their adoption of L.H.

is somewhat unusual. . . . I would like to have a home study done . . . the unusual aspect is, he is the biological father, but he lives in Arizona. And the Court doesn't feel entirely comfortable . . . making any kind of transition unless I have a home study done." The order reflecting the preliminary hearing concluded there was probable cause to proceed against Mother and Father 2, and that custody of both children with DHHR was proper. Further, an Interstate Compact Placement Agreement ("ICPC") home study of Father 1 in Arizona was ordered. The motion of Standing Grandparents to intervene was denied as premature.

An adjudicatory hearing was held on February 11, 2015. Mother and Father 2 filed voluntary written stipulations admitting abuse and neglect of the respective children and both requested six-month post-adjudicatory improvement periods. By order entered on March 24, 2015, the circuit court found that Mother had abused and neglected I.H. and L.H. and that Father 2 had abused and neglected I.H. A six-month improvement period, including rehabilitation treatment and drug testing, was ordered for both parents.

On April 22, 2015, Standing Grandparents filed a Renewed Petition to Intervene as of Right regarding L.H. contending that they had been the primary custodians of L.H. since he was about two months old. They further argued that Father 1 had relinquished his rights to the child by granting them guardianship of L.H. in February 2013, and by abandoning L.H. due to failing to maintain contact or provide financial support. Father 1 responded in opposition to the motion to intervene arguing that he was a non-offending father and had undergone a positive home study. He further denied relinquishing his rights to L.H. or that he had abandoned his son. Father 1 additionally claimed that the February 2013 document was written and signed in response to being told that Standing Grandparents were babysitting L.H. frequently. He claimed that he wanted to ensure his son's health and safety in the "absence of his presence." Father 1 also stated that he had paid child support to Mother; had had multiple visits with his son from four hours to two weeks in duration; had spoken on the telephone with his son hundreds of times; had sent gifts; and asserted that as a fit, non-offending, biological father, he should have custody.

An improvement period review hearing was held on May 1, 2015. The circuit court directed that the status quo continue. Following an improvement period hearing on July 22, 2015, the circuit court ordered DHHR to transport L.H. to Arizona for two weeks and to travel to Arizona for his return to West Virginia.

On August 28, 2015, an improvement hearing was held during which the circuit court received information regarding Mother and Father 2's participation in rehabilitation programs. DHHR updated the circuit court as to L.H.'s visit with Father 1 in Arizona reporting that the child seemed happy, there were no incidents, and the child was able to do a lot of activities unavailable locally. DHHR, Mother, and the Guardian agreed that L.H.

4

should be placed with his fit and non-offending father, Father 1, who sought to return to Arizona with his son. Over objection, the circuit court concluded that Standing Grandparents should be made intervenors subject to the control of the court. Additionally, the circuit court denied the request that Father 1 be permitted to return to Arizona with his son choosing, instead, to maintain the status quo and have a full hearing at a subsequent time.

At a hearing on October 19, 2015, the circuit court was updated regarding participation by Mother and Father 2 in rehabilitation programs and granted their requests for three-month extensions to their improvement periods. The circuit court held an evidentiary hearing regarding L.H. and relied upon the evidence elicited at disposition. A licensed social worker with DHHR continued to recommend placement of L.H. with Father 1 based upon her visit to the Arizona home, meetings with Father 1's extended family, and because he is a fit, non-offending parent with his parental rights intact.

The Guardian stated that "[m]y investigation of this case by talking to this man [Father 1] convinces me beyond a shadow of a doubt that not only is he competent to take care of his own child, but he is a decent father, a military man, a person who can perfectly well take care of this child. There's absolutely nothing wrong with him." He indicated that he believed that Standing Grandparents were determined to prevent Father 1 from having his child and that they were sabotaging Father 1's efforts to obtain his child. Nevertheless, the Guardian recognized that L.H. had had an ongoing relationship with Standing Grandparents, and, therefore, there should be contact between them.

Father 1 testified that he met Mother in late 2008 while he was in the military. They married in March 2009 and learned that Mother was pregnant in May 2009. In July 2009, he was deployed to Afghanistan. While deployed, Mother began a relationship with the son of Standing Grandparents. Father 1 was present for the birth of his son, L.H. The divorce of Father 1 and Mother was finalized in March 2010. Father 1 was stationed in Fort Bragg, North Carolina, where he remained until his honorable discharge in February 2011. He then moved to Arizona where his father, stepmother, and two younger sisters live. He is employed and has an associate of arts degree.

While stationed at Fort Bragg, Father 1 obtained leave to visit baby L.H. on weekends pursuant to a court order which is not of record here. Upon moving to Arizona, and before the institution of the abuse and neglect proceedings, Father 1 made approximately six trips to visit L.H.; some of these trips were for periods of up to two weeks. Father 1 also stated that he maintained regular contact with Mother and paid child support, which was deducted from his check while he was in the military and thereafter deducted by his employers. Additionally, he noted that he paid money directly to Mother when she requested additional

money, purchased gifts for L.H., and contributed money for a share of larger gifts. He also testified to making regular phone calls numbering in the hundreds to L.H.

Father 1 stated that he believed that Standing Grandparents were regular and frequent babysitters who helped with childcare, but that L.H. lived with Mother. In August 2014, Father 1 first learned there might be problems when Standing Grandmother called to inform him that Mother was leaving L.H. with her for long periods of time without seeing the child. In December 2014, Standing Grandmother called and informed Father 1 that DHHR was involved. Father 1 immediately purchased a plane ticket and was in West Virginia the next day intending to return to Arizona with L.H. Father 1 met with the DHHR worker who filed the Abuse and Neglect Petition and learned that he had been described by Standing Grandmother as an absentee father who wanted nothing to do with his son; he disavowed the worker of that notion. The DHHR worker told him he could not take L.H. and would have to go through the court system. Since the start of the instant abuse and neglect proceedings, Father 1 testified that Standing Grandparents do not take all his calls to L.H. and make excuses as to why L.H. cannot talk to him.

As to the document of February 11, 2013, Father 1 stated that Standing Grandparents contacted him stating that since they were babysitting L.H. often, they would like to have something that allowed them to make decisions for L.H. while he was in their care in case of an accident or a need for emergency treatment. Father 1 agreed and wrote the document on notebook paper without consulting an attorney. He stated that he did not intend for it to be either a relinquishment of his parental rights or a permanent or temporary transfer of physical or legal custody of L.H. Rather, he said that he believed that he was writing something sufficient for Standing Grandparents to make medical decisions regarding L.H. in the event of some emergency or accident.

Father 2 testified that he and Mother began their relationship in late 2012. L.H. lived with Mother in her apartment but spent time with Standing Grandparents. In 2014, both he and Mother had problems with drug addiction, and L.H. began staying longer and longer periods of time with Standing Grandparents. The testimony of Father 2 was largely corroborated by his mother, Grandmother, who indicated that, by mid-2014, Father 2 and Mother were largely homeless and that L.H. was with Mother and Father 2 on and off.

Standing Grandmother testified that, since the time of his birth, and despite having no biological relationship, she had never wavered from being a grandmother to L.H. Standing Grandmother met Mother in 2009 when Mother moved in with her son. After the birth of L.H., Mother started to work, and Standing Grandmother began watching L.H. during the work week. Mother left Standing Grandparents' son in November 2011, and, from that point on, Standing Grandmother stated that Mother left L.H. primarily with her; Mother would call

6

or visit sporadically. Standing Grandmother stated that she bought L.H.'s clothing, cared for him when he was sick, and fed him. Standing Grandmother represented that, in 2013, L.H. was staying in her home some eighty to eighty-five percent of the time. By 2014, Standing Grandmother stated that L.H. was in her home virtually one hundred percent of the time. Standing Grandmother vigorously disputed Father 1's testimony regarding the frequency of his visits with L.H. and said that no gifts and no money were ever sent to her for the care of L.H., although she had seen receipts showing that Father 1 sent money to Mother. Finally, Standing Grandmother testified that Father 1 wrote the February 11, 2013, "standing grandparent" document after she informed him that Mother was in jail.

Mother testified that, in 2011, she and L.H. lived together in an apartment while she attended college and worked full-time. She strongly disagreed with Standing Grandmother's characterization of how much time L.H. spent in Standing Grandmother's care, testifying that L.H. stayed with Standing Grandmother only when Mother worked and attended classes. Mother reported that the situation remained about the same during 2012 and 2013 and that her parents also assisted in caring for L.H. She admitted that, for a period of approximately six weeks in 2013, she went to Louisiana and left L.H. with Standing Grandparents. Mother also admitted that things began to change in 2014 when she started using drugs and that Standing Grandmother offered to keep L.H. more. Mother further admitted that a few days after giving birth to I.H., while also suffering from addiction, she signed consent to adoption papers regarding L.H. She testified that she later learned that she might be able to go into treatment and keep her parental rights; thus, she did not want to proceed with adoption of L.H. Instead, Mother testified she wanted to work on her addiction problem and regain custody of her son. In the meantime, she stated that she believed it would be in the best interest of L.H. to be with Father 1 in Arizona. Mother additionally testified that Father 1 maintained communication with L.H. and continued to visit with him after he moved to Arizona. She confirmed that Father 1 paid child support and participated in gift giving.

At the conclusion of the hearing, DHHR, the Guardian, and Mother all agreed that placement of L.H. should be physically and legally with Father 1 who was non-offending and fit. Instead, the circuit court concluded that Standing Grandparents were psychological parents, observed that Mother was a homeless drug addict since 2014, and found that Standing Grandparents provided L.H. the only safe and stable home he had known. Thus, the circuit court indicated that it was loath to remove L.H. from their care. The circuit court also concluded that Father 1 should have visitation with L.H. in Arizona. Finally, I.H. was to continue in the custody of Grandmother. The improvement periods of Mother and Father 2 were again extended.

A review hearing was held on December 30, 2015. The DHHR social worker testified that L.H. had been to Arizona to visit his Father for two weeks at Thanksgiving, and no

7

problems were encountered. I.H. continued in her placement with Grandmother, where she was growing, developing, and thriving. Mother remained in treatment, and her drug screen results were negative. Father 2 was enrolled in a treatment program. The improvement periods of Mother and Father 2 were extended and extended again in March 2016 upon reports that both parents were continuing to make progress in their respective in-patient treatment programs.

The circuit court entered an Order on June 29, 2016, granting further extensions of the improvement periods and ordering an MDT meeting to review and modify, if necessary, the visitation schedule of all parties. An amended order of August 4, 2016, directed that L.H. spend the month of July in Arizona with Father 1. An additional hearing was held on September 19, 2016, during which the circuit court was advised that Mother had completed inpatient treatment, had a job, and had acquired a home in Huntington, West Virginia. The court also was informed that DHHR had been facilitating visitation between Mother and the two children and between Father 2 and I.H. By order entered October 28, 2016, the circuit court directed that weekend visits between Mother and both children were to begin.

During the pendency of the case, the circuit court interviewed L.H., who was five or six years old, in the presence of the Guardian and the social worker three times. In summary, L.H. stated that he loves Standing Grandparents, who he calls mamaw and papaw; he is happy living with them; and he wants to stay there. L.H. also said his trips to Arizona to visit Father 1 were "pretty good"; he loves Father 1; and he wants Father 1 to visit him in West Virginia. L.H. finally said that he loves Mother and enjoys his visits with her and playing with I.H., but he does not want to live with Mother.

A dispositional hearing was held on November 18, 2016, at which time DHHR remarked that, with some reservation, it believed placement of both children would not be inappropriate with Mother and would avoid sibling separation. DHHR also acknowledged the "very real rights" of Father 1 regarding L.H. Mother, who successfully completed her improvement period, strongly advocated for reunification of the family such that both children be placed with her. Father 1 advocated that L.H. be placed with him. He acknowledged the issue of sibling separation and suggested that, as an alternative to L.H. living with him in Arizona, he and Mother share joint physical and legal custody with generous visitation with him in Arizona. Father 2 sought equal custody with Mother of I.H. Grandmother testified that she supported the efforts of Father 2 and Mother in regard to the work they had done to be drug free, but she did not believe that they were ready to be full-time parents and requested that I.H. remain in her care and custody. Standing Grandparents advocated for L.H. to remain with them. The Guardian recommended I.H. be placed with Mother with liberal visitation for Father 2. With respect to L.H., so as to avoid sibling

separation, the Guardian recommended placement with Mother and liberal visitation with Father 1; alternatively, he recommended L.H. be placed with Father 1.

On December 29, 2016, the circuit court entered an order awarding "permanent subsidized guardianship" of L.H. to Standing Grandparents and granting visitation with L.H. to Mother and Father 1. The order indicated that a parenting plan should be prepared and adopted to define visitation. Additionally, the order noted that Standing Grandparents should pursue a subsidized guardianship proceeding to enable a separate guardianship order to be entered. As to I.H., the order similarly awarded "permanent subsidized guardianship" to Grandmother with visitation afforded to Father 2 and Mother. Again, a parenting plan addressing visitation was to be prepared, and a separate guardianship proceeding was contemplated. To date, visitation plans have not been developed or adopted as to either child.

Mother and Father 1 appeal the circuit court's December 29, 2016, order. This Court consolidated the two appeals. DHHR takes the position that, as to both children, the circuit court erred in granting permanent subsidized placements. The Guardian agrees with Mother and Father 1 that the circuit court erred in granting permanent subsidized guardianships for the children. By contrast, Standing Grandparents contend that the circuit court order was proper in all respects. Father 2 did not appeal. Subsequent to the entry of the dispositional order, the circuit court appointed counsel for Grandmother. Before this Court, Grandmother joined the response of Standing Grandparents and sought leave from this Court to intervene as a party to the appeal, which motion was granted on September 20, 2017.

This Court has consistently found that appeals in abuse and neglect proceedings are subject to a compound standard of review:

> Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

9

Syl. pt. 1, *In the Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

We first consider the appeal of Mother who seeks reunification with her children. Unfortunately, this Court has received adverse information regarding Mother's circumstances pursuant to Rule 11(j) of the West Virginia Rules of Appellate Procedure, which requires the submission of written statements of change of circumstances. Counsel for Mother advised that he has had no interaction with Mother since he filed the brief in March 2017, and her whereabouts are unknown. DHHR's Rule 11(j) update indicates that Mother may have relapsed, that she has been in and out of drug treatment programs, and that she has not contacted or visited her children since the entry of the dispositional order. Grandmother also filed a Rule 11(j) update noting that Mother last visited I.H. in December 2016, and an unsuccessful attempt at a video chat was made in April 2017. Standing Grandmother indicated in her Rule 11(j) update that Mother has had no contact of any kind with L.H. since December 2016. Standing Grandmother represented that she believed that Mother had relapsed and that she had been expelled from a drug rehabilitation facility due to lack of program compliance. The Rule 11(j) statement of the Guardian was consistent with the other updates.

This Court observes that Mother had almost two years of improvement periods, and the record reflects an abundance of efforts made by DHHR to facilitate her admission to treatment programs and to assist with travel arrangements for visits with her children. The record further establishes that DHHR has provided numerous remedial and reunification services to Mother. However, it is apparent that there is no reasonable likelihood that the conditions of abuse and neglect can be substantially corrected in the near future. *See* Syl. pt. 2, *In re R.J.M.*, 164 W. Va. 496, 266 S.E.2d 114 (1980). Thus, this Court hereby permanently terminates the parental, custodial, and guardianship rights and responsibilities of Mother to both L.H. and I.H.

Furthermore, although he is not a party to this action, it should be noted that DHHR reported in its Rule 11(j) status update that Father 2 had had his parental rights to I.H. terminated, although no documentation thereof has been provided. Moreover, the other parties have represented in their status updates that Father 2 may have relapsed, has refused to seek or re-enter drug rehabilitation, has not exercised visitation with I.H. since December 2016, and last had contact with I.H. through a video chat in April 2017. Given that the status of Father 2 with respect to his parental rights to I.H. is unclear and in light of the updated facts regarding him, we direct the circuit court to immediately convene a hearing to consider this current information and to determine whether termination of his parental rights is appropriate.

10

We now turn our attention to the questions raised in Father 1's appeal. Although a number of issues are raised, the dispositive question that must be answered is who should have custody of L.H. In that regard, this Court must consider the rights of Father 1 as the biological father; whether those rights were relinquished; the status and rights of Standing Grandparents; and the best interests of L.H.

The circuit court found that Father 1 failed to recognize Mother's personal and parental deficiencies and signed guardianship papers for Standing Grandparents who were found to be the primary caretakers of L.H. Father 1 argues that he is a fit, non-offending parent who never relinquished custody and that the circuit court erred in emphasizing and relying on the one-page handwritten February 11, 2013, document. On the other hand, Standing Grandmother contends that Father 1 wrote the guardianship document referring to them as "standing grandparents" and thereby transferred health care and financial responsibility for L.H. with the knowledge that L.H. was a fixture in their home and of Mother's serious drug problem. In fact, Standing Grandparents assert that the only error committed by the circuit court was that it failed to find that Father 1 abandoned his son with the signing of the guardianship document and his other acts or failures to act.

We first address the finding of the circuit court that Standing Grandparents are psychological parents, and we agree with the circuit court's conclusion. As this Court has enunciated:

> A psychological parent is a person who, on a continuing day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills a child's psychological and physical needs for a parent and provides for the child's emotional and financial support. The psychological parent may be a biological, adoptive, or foster parent, or any other person. The resulting relationship between the psychological parent and the child must be of substantial, not temporary, duration and must have begun with the consent and encouragement of the child's legal parent or guardian. To the extent that this holding is inconsistent with our prior decision of *In re Brandon L.E.*, 183 W. Va. 113, 394 S.E.2d 515 (1990), that case is expressly modified.

Syl. pt. 3, *In re Clifford K.*, 217 W. Va. 625, 619 S.E.2d 138 (2005). In elaborating on the definition of a psychological parent, this Court has observed:

> In the cases in which this Court has determined a person to be a psychological parent to a child, that person typically has resided in the child's household and interacted with the child on a daily basis. *See, e.g., In re Clifford K., id.; In re Jonathan G.*, 198 W. Va. 716, 482 S.E.2d 893 (1996); *Simmons v. Comer*, 190

11

W. Va. 350, 438 S.E.2d 530 (1993); *Honaker v. Burnside*, 182 W. Va. 448, 388 S.E.2d 322 (1989). Moreover, a psychological parent is one who essentially serves as a second parent to a child and is a relationship to which the child's parent has consented. *See generally In re Clifford K.*, 217 W. Va. 625, 619 S.E.2d 138; *Simmons*, 190 W. Va. 350, 438 S.E.2d 530; *Honaker*, 182 W. Va. 448, 388 S.E.2d 322.

*In re Visitation & Custody of Senturi N.S.V.*, 221 W. Va. 159, 167, 652 S.E.2d 490, 498 (2007) (per curiam).

While recognizing the role and value of psychological parents, this Court also has cautioned against an undue over-extension of the concept. In *Clifford K.*, this Court remarked that "the limited rights of a psychological parent cannot ordinarily trump those of a biological or adoptive parent to the care, control, and custody of his/her child." 217 W. Va. at 644, 619 S.E.2d at 157. Likewise, in *Honaker v. Burnside*, 182 W. Va. 448, 452, 388 S.E.2d 322, 325 (1989), we observed that "[a]lthough we recognize the attachment and secure relationship" between a child and a psychological parent, "such bond cannot alter the otherwise secure natural rights of a parent[.]" This Court further discussed the issue in *Senturi*, stating,

[o]bviously, a child will hold in high esteem any person who looks after him/her, attends to his/her needs, and lavishes him/her with love, attention, and affection. However, simply caring for a child is not enough to bestow upon a care giver psychological parent status. Were this the law of the State, any person, from day care providers and babysitters to school teachers and family friends, who cares for a child on a regular basis and with whom the child has developed a relationship of trust could claim to be the child's psychological parent and seek an award of the child's custody to the exclusion of the child's parent. Clearly, this is not the result contemplated by this Court's prior holding [in *Clifford K.*]. . .

*Senturi*, 221 W. Va. at 168, 652 S.E.2d at 499.

Here, the evidence clearly establishes that L.H. spent a large portion of his life in the home and care of Standing Grandparents who served in the role of parents. That is where the child was staying at the time the Petition was filed in December 2014, and the record shows that he resided in their home on a regular, full-time basis since at least the Spring of 2014, and periodically before then. Mother depended on Standing Grandparents to care for L .H. as she struggled with drug addiction. Prior to that time, the record is clear that she relied heavily on Standing Grandparents to care for L.H. while she worked and went to

school. Moreover, this was not a short-term or temporary arrangement, and Mother promoted, encouraged, and fostered the relationship between Standing Grandparents and L.H. It also is abundantly clear from the record that Father 1 was aware that L.H. spent a great deal of time being cared for by Standing Grandparents and that he recognized them as his son's "standing grandparents." Additionally, the record reflects that Father 1 often called L.H. at the home of Standing Grandparents, visited with L.H. at that home, and occasionally stayed with L.H. at the home during such visits. Thus, it is apparent that, with the encouragement of Mother and Father 1, Standing Grandparents were providing day-to-day care and emotional, physical, and financial support amounting to serving as psychological parents for L.H. Consequently, we find that the circuit court committed no error in concluding that Standing Grandparents were psychological parents in their relationship with L.H. However, that is not the end of the inquiry. We also must consider the rights of the biological parent and the child.

As to a biological parent's rights with respect to a child, this Court held in *Whiteman v. Robinson*, 145 W. Va. 685, 116 S.E.2d 691 (1960):

> A parent has the natural right to the custody of his or her infant child, unless the parent is an unfit person because of misconduct, neglect, immorality, abandonment, or other dereliction of duty, or has waived such right, or by agreement or otherwise has transferred, relinquished or surrendered such custody, the right of the parent to the custody of his or her infant child will be recognized and enforced by the courts.

Syl., *id.*

Moreover, this Court has long recognized that a natural parent's right to the custody of his or her child is grounded in the due process provisions of both the West Virginia and the United States' Constitutions. Specifically, this Court has held:

> In the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions.

Syl. pt. 1, *In re Willis*, 157 W. Va. 225, 207 S.E.2d 129 (1973). In *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000), the United States Supreme Court discussed this liberty interest by observing that "[t]he liberty interest at issue in this case–the interest of parents in the care, custody, and control of their children–is perhaps the oldest of

13

the fundamental liberty interests recognized by this Court." *Id.*, 530 U.S. at 65, 120 S. Ct. at 2060, 147 L. Ed. 2d 49.

We observe that the circuit court did not find that Father 1 was unfit. Nor did the circuit court find misconduct, neglect, immorality, or abandonment by Father 1. Neither were there allegations against Father 1 in the Abuse and Neglect Petition. Father 1 has sought custody of his son throughout the proceedings and had a positive home study in Arizona, as well as the support of Mother, DHHR, and the Guardian for placement. Nevertheless, the circuit court divested him of custody finding that Father 1 was an absentee parent who remained content to allow third-party, non-relatives to raise his son. However, this Court finds that, in the absence of unfitness, the non-offending biological parent, Father 1, has a fundamental liberty interest in the care, custody, and control of his child, L.H. That too, does not end the inquiry, though. Inasmuch as the circuit court heavily relied upon the February 2013 "standing grandparent" document, we must consider whether Father 1 relinquished his parental rights.

In *Overfield v. Collins*, 199 W. Va. 27, 37, 483 S.E.2d 27, 37 (1997), this Court addressed the formalities of the transfer of temporary or permanent custody of children by biological parents and set out a "few simple rules [to] guide the bench and the bar of this State." This Court held that if a natural parent intends to voluntarily transfer either temporary or permanent custody to a third party, the document effecting the transfer must expressly provide for the nature of the transfer of custody. If the document does not so provide, the presumption is that the transfer is temporary. Further, the burden of proof is on the third party to prove by clear and convincing evidence that it was the intent of the parent to permanently transfer custody of the child. *See* Syl. pts. 4, 5, & 6, *id.*[9]

---

[9]*See* Syl. pts. 4, 5, & 6, *Overfield v. Collins*, 199 W. Va. 27, 483 S.E.2d 27 (1996) (Syl. pt. 4.: "If a natural parent intends to voluntarily transfer *permanent* custody of a child to a third person, then the document effecting that transfer should expressly provide that it is the intention of the parent to permanently transfer the custody of the child to the third person." (emphasis added)); (Syl. pt. 5: "If a natural parent intends to voluntarily transfer *temporary* custody of a child to a third person, then the document effecting the transfer should expressly provide that it is the intention of the parent to temporarily transfer custody to the third person." (emphasis added)); (Syl. pt. 6: "In the unlikelihood that the scrivener of a document voluntarily transferring the custody of a child between a parent and a third person fails to express any intention as to the duration of the custodial change, it shall be presumed that the transfer is temporary, and the burden of proof shall be upon the third person to prove by clear and convincing evidence, either intrinsic or extrinsic, that it was the intention of the parent to transfer permanent custody of the child to the third person.").

14

The February 11, 2013, document is not a model of clarity. This is understandable given that it was written by a twenty-two-year-old young man with no legal counsel. The document does not explicitly state whether "guardianship" is temporary or permanent and sets forth no duration of time other than stating that, "in the absence of my presence," the "standing grandparents" could make financial and medical decisions for L.H. Father 1 denies that he intended any transfer of custody of L.H., whether temporary or permanent. He maintains that, at the request of Standing Grandparents, his goal was to provide for the health and care of his child who was frequently being cared for by them. It also is telling that, prior to the initiation of the instant abuse and neglect proceedings, no judicial effort was undertaken by Standing Grandparents to formalize the claimed permanent care and custody of L.H. Moreover, Father 1 refused to sign consent for adoption documents as requested by Standing Grandparents. Finally, upon being informed of the involvement of DHHR, Father 1 immediately traveled to West Virginia with the expectation of returning to his home with his son and has repeatedly and consistently requested custody. The use of the term "in the absence of my presence" in the February 11, 2013, document, together with the lack of any terms evidencing a transfer of physical care, custody, maintenance, or control, compels the conclusion that Father 1 did not transfer custody of L.H. on either a temporary or permanent basis. Nor does the document, or other facts of record, evidence an intent to relinquish Father 1's parental rights.

In addition to the interests of the psychological parents and the biological father, the welfare of L.H. also must be considered. This Court has long recognized that, "[a]lthough parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Syl. pt. 3, *In re Katie S.*, 198 W. Va. 70, 479 S.E.2d 589 (1996). Moreover, "[i]n a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided." Syl. pt. 1, *State ex rel. Cash v. Lively*, 155 W. Va. 801, 187 S.E.2d 601 (1972). Certainly, as the circuit court recognized, a child who has resided with a non-parent for a significant period of time and bonded with the non-parent, when the biological parent had the right to maintain substantial contact with the child and has failed to do so, has equitable rights to be considered when making decisions that contemplate a change of the child's custody. *See* Syl. pt. 4, *In the Interest of Brandon L.E.*, 183 W. Va. 113, 394 S.E.2d 515 (1990). As this Court reiterated in *In re Abbigail Faye B.,* 222 W. Va. 466, 480, 665 S.E.2d 300, 314 (2008), "even though parents have substantial rights in guardianship matters, so do the children involved."

Here, the circuit court acknowledged that, at the ages of five and six, L.H. was substantially younger than the age of discretion of fourteen. *See In the Interest of Jessica G.*, 226 W. Va. 17, 697 S.E.2d 53 (2010) (per curiam). However, because the circuit court found the child to be bright and articulate, the court concluded that L.H.'s stated wish to live with

Standing Grandparents, who he called mamaw and papaw, while his Father visits him should not be disregarded. Thus, the circuit court concluded that, inasmuch as L.H. was happy, thriving, and doing well in school, his placement should not be disturbed. We conclude that the circuit court erred in placing an inappropriate emphasis on the stated desires of a very young child who does not have the maturity to understand the implications of what is being asked and answered. A thorough review of the transcripts of the interviews reveals a child who loves his Father, his Mother, and his Standing Grandparents, and who answers questions in a fashion one might expect of a child of five- and six-years-old.

This Court observes that, while no visitation plan has been implemented, Father 1 nevertheless has maintained regular telephone and electronic communication with L.H. Father 1 also recently had a several day visitation with L.H. that was reportedly enjoyable and went well. The Court additionally has been informed that, in an effort to be closer to L.H., Father 1 has moved to North Carolina, where his mother lives and which is four hours from the home of Standing Grandmother. Father 1 appears to recognize the rights of his son to continue his close relationship with Standing Grandmother and represents that, if he is awarded custody, L.H. would be close enough to visit Standing Grandmother.

In consideration of the facts and the law, this Court finds that the circuit court erred in balancing the rights of the biological father, the psychological parents, and the child by failing to afford the biological, fit, and non-offending father, Father 1, custody of his son, L.H. Accordingly, we find that Father 1 is entitled to custody of his son. However, in recognition of the child's need for stability and security, we remand this matter to the circuit court with directions to convene a hearing forthwith to develop a meaningful transition plan to accomplish the change of placement in a progressive manner that affords due consideration to the parties' home, work, and school schedules as well as the daily life of L.H. Moreover, the best interests of L.H. will be served by the circuit court affording reasonable visitation rights to Standing Grandmother once the transition has been completed and L.H. is in the custody of Father 1. Thus, the circuit court is further directed to establish an appropriate visitation plan that supports a continued relationship between L.H. and Standing Grandmother. *See generally Honaker v. Burnside,* 182 W. Va. 448, 388 S.E.2d 322 (discussing importance of transition planning and visitation in conjunction with a change in placement).

Cases such as these present some of the most important matters that courts are called upon to evaluate and decide. Courts are asked to grapple with the most fundamental issues of childhood and parenthood as well as emotional, social, and environmental relationships. These concerns are fraught with the impact of the changing dynamic of a traditional family structure, increasing diversity of families, the lightspeed changes in technology affecting the method and manner of communication and socialization, and an ever increasingly mobile

16

society. In these circumstances, this Court is acutely aware of the impact of each and every decision affecting children and those who love them. In this instance, L.H. is fortunate to be loved by parties who want custody and are eager to provide and care for him. This Court's decision will effect a major change in the life of L.H. This child's future happiness and emotional security will be dictated, in large part, on how Father 1 and Standing Grandmother approach the coming months. Their every effort and sacrifice must be directed to supporting L.H. such that any continuing strains in their relationship must be set aside. Their love for L.H., together with his best interest, must be the guiding star for their conduct as they move forward to meet the challenges presented by a change of placement.

For the foregoing reasons, the December 29, 2016, order of the Circuit Court of Raleigh County is reversed as to the parental rights of Mother, which are hereby terminated as to infants L.H. and I.H.; reversed as to custodial placement of L.H., of whom custody is determined properly to be with the fit and non-offending biological parent, Father 1; and further remanded for proceedings consistent with this Court's directions as stated herein.

Reversed and Remanded.

**ISSUED:** November 7, 2017

**CONCURRED IN BY:**

Chief Justice Allen H. Loughry II
Justice Robin Jean Davis
Justice Margaret L. Workman
Justice Menis E. Ketchum, II
Justice Elizabeth D. Walker

17